PARACOR FINANCE, INC., (fka Elders Finance, Inc.), a New York Corporation; Cargill Financial Services Corporation, a Delaware Corporation; Lutheran Brotherhood, a Minnesota Corporation; Farm Bureau Life Insurance Company, an Iowa Corporation, Plaintiffs–Appellants,

v.

GENERAL ELECTRIC CAPITAL CORPORATION, a New York Corporation; Jordan D. Schnitzer; Burton A. Burton; Jerry C. Holland, Defendants–Appellees.

No. 94–15633.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 14, 1995.

Decided March 13, 1996.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 20, 1996.

1154

Michael Traynor, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, California, for the plaintiffs-appellants.

Robert A. Van Nest and Michael J. Proctor, Keker & Van Nest, San Francisco, California, for defendant-appellee General Electric Capital Corporation.

Robert A. Shlachter, Stoll, Stoll, Berne, Lokting & Schlachter, Portland, Oregon, for defendant-appellee Jordan D. Schnitzer.

Charles D. Chalmers, Skjerven, Morrill, MacPherson, Franklin & Friel, San Francisco, California, for defendant-appellee Burton.

Before FLETCHER, POOLE, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

In reviewing this saga of a debenture offering turned sour, we must decide whether any of the supporting cast on the offeror's side have violated the securities laws. In particular, we must determine whether the lender in a financial transaction should be considered a "controlling person" of its borrower.

I

We begin with the facts that led up to the debenture offering at issue here as an appeal from a "Final Partial Judgment" under Federal Rule of Civil Procedure 54(b) which recapped a series of prior orders of the district court granting summary judgments. Jordan Schnitzer, a Portland businessman, hired Bear, Stearns & Co. to locate a profitable corporation which he could purchase and

merge with an unprofitable corporation he owned in order to utilize his corporation's net operating loss carryforwards and obtain certain tax benefits. He was directed to Casablanca Industries, Inc., a California manufacturer of ceiling fans.

In December 1988, Schnitzer approached General Electric Capital Corp. ("GE Capital") for financing for a leveraged buyout of Casablanca. After undertaking its own due diligence, GE Capital agreed to provide a bridge loan for the acquisition. One condition of the bridge loan was that the acquired Casablanca would immediately sell $27 million in high-yield subordinated debentures (aka "junk bonds"), which would be used partially to pay down the loan. The bridge financing would then be replaced with permanent financing by GE Capital. A bridge loan of $53 million to Casablanca Acquisition Corp., a company formed by Schnitzer to make the acquisition, was eventually made in April 1989.

In March 1989, Shearson Lehman Brothers Inc. ("Shearson") was retained to place the subordinated debentures with investors. Shearson prepared a Private Placement Memorandum ("Placement Memorandum") for this purpose. The Placement Memorandum contained various representations about Casablanca including sales projections of $83.3 million and earnings of $8.5 million for fiscal year 1989. Shearson distributed the Placement Memorandum to various institutional investors active in the subordinated debt market.

Elders Finance, Inc. (now known as Paracor Finance, Inc.), Cargill Financial Services Corp., Lutheran Brotherhood, and Farm Bureau Life Insurance Co. (collectively "the Investors") received the Placement Memorandum. During the following weeks, analysts for the Investors performed their own due diligence on the offering. The analysts inspected Casablanca's books, met with its management, visited Casablanca's offices, and had occasional contacts with GE Capital (the substance of which forms part of this dispute). By early May, the Investors had

decided to purchase the debentures.[1] The closing of the deal was delayed until late June, however, by continuing negotiations over its terms.

By June, Schnitzer had successfully completed his tender offer and merged his corporation with Casablanca. In the interim, Casablanca's fortunes had been declining. Casablanca's April sales were only $7.88 million, compared with projections of $10.195 million. May and June sales were also below projections. During this time, Burton Burton was the CEO of Casablanca (though the extent of his involvement in its affairs is disputed), and Jerry Holland was the President.

A Debenture Purchase Agreement ("Purchase Agreement") was eventually negotiated between the Investors and Casablanca. In the Purchase Agreement, Casablanca represented that "[s]ince March 31, 1989, Casablanca has not suffered any Material Adverse Effect." The Investors represented that they "had access to the information [they] requested from [Casablanca]" and that they "made [their] own investment decision with respect to the purchase of the Debentures ... without relying on any other Person." On June 17, 1989, the parties signed the deal documents. On June 23, the Investors wired $27 million to GE Capital as the escrow agent for the various parties to the transaction.

After its first payment of interest on the debentures in August, Casablanca defaulted. Casablanca filed for bankruptcy a little over a year later in November 1990. The Investors, needless to say, were upset.

In March 1991, the Investors filed suit against everyone involved in the transaction, including Casablanca, GE Capital and Schnitzer, Burton, and Holland (collectively "the defendants"). The Investors claimed (1) primary and secondary violations of section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, (2) violations of Oregon Revised Statute § 59.115 (the "Oregon Securities Law"), and (3) common-law torts of

---

1. Around this time, GE Capital also hired Valuation Research Corp. ("VRC") to render a solvency opinion on Casablanca. VRC subsequently prepared a June 16, 1989 solvency opinion for the debenture offering.

fraud and negligent misrepresentation. The Investors also brought a claim of unjust enrichment against GE Capital alone. The Investors' claims against Casablanca were subject to the bankruptcy stay.[2]

After a round of discovery, the defendants brought motions for summary judgment on the section 10(b) claims. The district court originally rendered a decision on statute of limitations grounds, but reset the hearing on the defendants' motions after Congress altered the statute of limitations.[3] In January 1992, the court orally granted GE Capital's and Burton's motions for summary judgment against the Investors on the merits but denied Holland's motion. The court also denied Schnitzer's motion without prejudice because the Investors had yet to depose him.

The defendants (other than Schnitzer) next moved for summary judgment on the Oregon Securities Law and common-law claims. In August 1992, the district court orally denied GE Capital's and Burton's motions on the Oregon Securities Law claims, stating: "Bottom line, I think this case is going to have to go to trial at least on the Oregon statutes." The district court granted GE Capital's and Burton's motions against the Investors on the fraud and negligent misrepresentation claims.[4]

In February 1993, Schnitzer re-filed his motion for summary judgment. Among other things, Schnitzer (joined by the other defendants) claimed that the Oregon Securities Law claims were precluded by a New York choice-of-law provision in the debentures. In April 1993, in its Order on Motions, the district court held that the New York choice-of-law provision precluded application of the Oregon Securities Law and therefore dismissed the Oregon Securities Law claims against all of the defendants, superseding its earlier ruling. Schnitzer had also re-moved for summary judgment on the section 10(b) claims and the common-law claims. Because of the district court's previous rulings in favor of GE Capital and Burton on these claims, the Investors did not oppose Schnitzer's motion, but reserved their right to appeal.

GE Capital next moved for summary judgment on the Investors' unjust enrichment claim against it. In May 1993, the district court orally granted GE Capital's motion.

Finally, the Investors moved for reconsideration of the rulings on the section 10(b) and common-law claims and on the New York choice-of-law ruling. In December 1993, the district court denied the motion.[5] On March 15, 1994, the court entered its Final Partial Judgment pursuant to Federal Rule of Civil Procedure 54(b), which recapped all of its holdings in the case.

The Investors timely brought this appeal and make three primary claims. First, they claim that both GE Capital and Burton have committed violations of section 10(b) and Rule 10b-5. Second, they claim that both GE Capital and Burton are secondarily liable as "controlling persons" of Casablanca, who has allegedly also committed violations of section 10(b) and Rule 10b-5. Third, they claim that GE Capital and Burton have violated the Oregon Securities Law, and that the New York choice-of-law clause in the debentures does not preclude them from

2. The Investors' claims against Shearson and VRC were settled early in the proceedings. The Investors' claims against captioned defendants Rand Clark, Dean Ward, and John Pearson (officers of Casablanca) were dismissed at the Investors' request.

3. The district court had grounded its decision that the Investors' § 10(b) claims were time-barred on the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). However, Congress shortly thereafter repealed the retroactive effect of *Lampf* by amending the Securities Exchange Act with § 27A, 15 U.S.C. § 78aa–1. The Supreme Court has subsequently held that a portion of this amendment, § 27A(b), is unconstitutional. *See Plaut v. Spendthrift Farm, Inc.*, —— U.S. ——, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).

4. The court took no action on the Oregon Securities Law or common-law claims against Holland.

5. The court, in its Order on Motion for Reconsideration, also noted that the Investors consented to the dismissal of defendant Holland, even though Holland's earlier motion for summary judgment had been denied, so that they could take an appeal from a final judgment on the case as a whole. The district court stayed all proceedings against Holland pending the results of this appeal.

bringing this claim. We address each of these claims in turn.

## II

The Investors contend that GE Capital and Burton are primarily liable for violations of section 10(b) and Rule 10b–5 for making affirmative misrepresentations and for failing to disclose material facts about Casablanca's sales. The heart of the Investors' claim is that they were not provided with the negative sales data for the three months immediately prior to the closing.

■ Rule 10b–5(b), enacted under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). The elements of a Rule 10b–5 claim are: (1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1281 (9th Cir.1982). If one of these elements is missing, the Investors' claim fails. *Id.*

## A

Regarding GE Capital, both of the first two elements pose significant obstacles to the Investors' claims. As this is an appeal from summary judgment, we will look at the facts underlying these elements in the light most favorable to the Investors. *See Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994).

### 1

■ The heart of the Investors' Rule 10b–5 claim is that GE Capital knew of Casablanca's poor April–June quarter sales results and failed to disclose them. It takes more than mere knowledge, however, to amount to an actionable omission. "Rule

10b–5 is violated by nondisclosure only when there is a duty to disclose." *Jett v. Sunderman*, 840 F.2d 1487, 1492 (9th Cir.1988). "[T]he parties to an impersonal market transaction owe no duty of disclosure to one another absent a fiduciary or agency relationship, prior dealings, or circumstances such that one party has placed trust and confidence in the other." *Id.* at 1493 (citing *Chiarella v. United States*, 445 U.S. 222, 232, 100 S.Ct. 1108, 1116–17, 63 L.Ed.2d 348 (1980)). A number of factors are used to determine whether a party has a duty to disclose: (1) the relationship of the parties, (2) their relative access to information, (3) the benefit that the defendant derives from the relationship, (4) the defendant's awareness that the plaintiff was relying upon the relationship in making his investment decision, and (5) the defendant's activity in initiating the transaction. *See Jett*, 840 F.2d at 1493.

Canvassing these factors, the relationship between GE Capital and the Investors did not rise to the level at which GE Capital assumed a duty to disclose. First, GE Capital had no relationship with the Investors prior to the debenture transaction. During the transaction, it had no contact whatsoever with two of the Investors (Lutheran Brotherhood and Farm Bureau Life Insurance), and its contact with the other two amounted to a couple of brief face-to-face meetings and a handful of telephone calls. Second, the Investors' access to information was comparable to GE Capital's. After GE Capital funded the bridge loan in April, Casablanca was required to provide daily "Open Sales Order" reports and weekly "Tuesday" reports. Although the Investors did not receive these reports, they had their own channels for information. The Investors, sophisticated institutions with competent analysts, conducted their own due diligence. They also signed representations that they were provided with all information that they requested, and conceded that such representations were accurate.[6]

---

6. The Investors allege that Cargill's Jeff Leu requested from Shearson, but was denied, relevant financial reports for April and May. He was given the excuse that Casablanca had been distracted by the leveraged buyout and had not yet

prepared the reports. However, Leu also stated: "We were always given access to the people that we wanted to talk to. We would have preferred to have the monthly financial statements that we didn't get, but we thought it was a reasonable

Third, GE Capital certainly benefitted from the Investors' purchase of the debentures by having their exposure on the $53 million unsecured bridge loan effectively reduced. Fourth, GE Capital informed Cargill Financial Services and Elders Finance on more than one occasion and in writing that they could not rely on GE Capital. When GE Capital did provide Elders Finance with a copy of its business survey of Casablanca, it insisted that Elders Finance state in writing that it was not relying on GE Capital. Finally, GE Capital effectively initiated the debenture transaction, because its bridge loan to Schnitzer was conditioned on the debenture offering being made.

Taken together, these factors show that GE Capital initiated a financial transaction from which it stood to benefit. They do not show, however, that GE Capital assumed a relationship of trust and confidence with the Investors. The Investors, in a one-shot deal with GE Capital's participation, were expected to do their own due diligence and were carefully warned not to rely on GE Capital on the limited occasions GE Capital shared information with them. Similarly, in *Jett*, 840 F.2d at 1492–93, we held that a lender to a limited partnership had no duty to disclose to the investors in that partnership where there was no prior relationship between the lender and the investors and the lender did not participate in the transaction in any way that would induce the investors to rely on it. The mere fact that the lender was aware of information regarding the partnership, while the investors were not, did not create a duty. *See also Gray v. First Winthrop Corp.*, 776 F.Supp. 504, 510 (N.D.Cal.1991) (lender to real estate limited partnership had no duty to disclose to investors in that partnership). In sum, GE Capital cannot be held liable for its alleged omissions because it never had a duty to disclose to the Investors in the first place. Without actionable misrepresentations or omissions, the Investors' claim cannot be pursued.

■ According to the Investors, GE Capital's employees made several oral misrepresentations to employees of Elders Finance and Cargill Financial Services about Casablanca's performance.[7] For example, at a late April meeting, GE Capital's Steve Read stated that Casablanca was "a good property, a good investment." Similarly, at a meeting in late May, GE Capital's Peter McGurty indicated that "the company was doing very well, and [he] had tremendous enthusiasm for the deal." The Investors also point to a handful of telephone conversations with GE Capital employees. For example, in early May, GE Capital's Jill Bengtson told Elders Finance's Jeffrey Gerstel that Casablanca was performing in accordance with expectations. According to Gerstel, Bengtson also stated that Casablanca would still be able to satisfy various financial covenants in the Purchase Agreement.

■ Reviewing all of the Investors' evidence, these comments merely show that GE Capital was expressing faith in the deal and optimism about Casablanca's prospects. General expressions of optimism of this nature are only actionable as misrepresentations if (1) the statement is not genuinely believed, (2) there is no reasonable basis for such expression, or (3) the speaker is aware of undisclosed facts undermining the statement. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

It is somewhat troubling that while GE Capital was smiling and nodding to the Investors it may have been grimacing in private. At the same time GE Capital's Bengtson was telling Elders Finance's Gerstel that Casablanca was performing in accordance with expectations, Bengtson had also sent a memo to her superior at GE Capital, Scott Lavie, informing him about Casablanca's declining sales. However, the Investors have not introduced evidence that GE Capital lacked at least a reasonable basis for their various representations, even though in hind-

---

position that the company was not able to get those out." In addition, Elders Finance's Thomas Goossens stated that he received all financial material he requested during this period.

7. The Investors concede that GE Capital had no communications whatsoever with Lutheran Brotherhood and Farm Bureau Life Insurance.

sight they may now appear a little too rosy. GE Capital's Lavie stated that, as of the closing date, GE Capital was "aware that [Casablanca's fan division] itself [would] not attain its full projections, but we also realized on the twelve months year-to-date, the results were not significantly off what was projected."

In addition, the representations the Investors received from GE Capital must be viewed "in light of all the information then available to the market." *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 512 (9th Cir.1991). On several occasions, the Investors were informed that Casablanca's sales were off, even if they did not hear it from GE Capital. Cargill Financial Service's Jeff Leu stated that he "had heard [from Casablanca] that sales were off slightly, but cash flow was on track." Jouko Tamminen, another of Cargill's analysts, stated: "I think [Casablanca] mentioned that sales for [April] were off, but [they] also mentioned that profitability had not suffered." Likewise, Paul Ocenasek, Lutheran Brotherhood's chief analyst, stated that Shearson told him that "April sales had come in a little weak, but cash flow was on target. And cash flow was back on track, and everything was back on track in May." The Investors were not novices in the financial markets; these statements, although hedged with reassurances, were sufficient to put them on notice that Casablanca's fan sales were not breezing along as usual. In light of all of the information available to them, and the generality of GE Capital's statements, the Investors have failed to demonstrate an issue of material fact as to whether GE Capital made actionable misrepresentations.

### 2

■ Even if the Investors had succeeded in meeting the first element of a Rule 10b–5 claim, they would also have to demonstrate that they had relied on GE Capital. Justifiable reliance "is a limitation on a rule 10b–5

action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm." *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir.1992) (internal quotation marks omitted).

■ The Investors have failed to introduce an issue of material fact that they justifiably relied on GE Capital. Significantly, in Section 4.4 of the Purchase Agreement the Investors recited that they were given "access to the information [they have] requested from the Company" and that they "made [their] own investment decision with respect to the purchase of the Debentures ... without relying on any other Person." Elders Finance's Thomas Goossens conceded that the representations in Section 4.4 were true as of the signing of the Purchase Agreement. These representations do much to defeat the Investors' claims of reliance on GE Capital.[8] In *Bank of the West v. Valley Nat'l Bank of Arizona*, 41 F.3d 471, 476 (9th Cir.1994), in the analogous situation of a common-law fraud cause of action, a lead bank and a participating bank in a loan to a corporation signed a participation agreement. In the agreement, the participating bank represented that it "independently and without reliance upon any representations of [the lead bank] made and relied upon [its] own credit analysis and judgment." This language, we held, "implies that, to the extent that it did rely on [the lead bank], [the participating bank's] reliance was not justifiable." *Id.* at 478. Further, we held, "the contract could and did control whether such reliance would be 'justifiable' for purposes of a fraud claim." *Id.* Likewise, here, the Investors' contractual representation that they did not rely on any other person goes far to defeat their present claims that they did precisely the opposite and relied on GE Capital.

In addition, GE Capital agreed to give Elders Finance's analysts a copy of its business survey of Casablanca only after they signed a letter stating that Elders Finance was not relying on GE Capital to "evaluat[e] the merits, risks or value of Casablanca or

8. The Investors argue that Section 4.4 is a standard representation designed to qualify the transaction for exemption from registration under SEC Regulation D, 17 C.F.R. §§ 230.501–508. Even if it is—and there is no mention of Regulation D in Section 4.4—that would not seem to be a reason to discount the substance of the representation the parties made. Otherwise, Regulation D would be reduced to a mere formality.

the Debentures." Elders Finance's Gerstel said he had no problem with signing such a letter. This "non-reliance letter," though broadly worded, may have only applied to the business survey being turned over. Nevertheless, it is indicative of the relationship the parties believed pertained between them.[9]

Taken together, these factors suggest that, regardless of the nature of GE Capital's representations, the Investors did not justifiably rely on them.

Since the Investors fail to establish either of the first two elements of their Rule 10–b5 claim against GE Capital, we do not reach the remaining two.

### B

Our analysis of Burton's role in the transaction is much simpler. Even in its most favorable light, the Investors' evidence of misrepresentations by Burton is virtually nonexistent. The Investors point to the fact that the projections for Casablanca, which Burton helped prepare, were included in the Placement Memorandum. However, they fail to note that Burton assisted with such projections back in August 1988, long before the leveraged buyout and debenture offering were in the works. The Investors also point to the fact that Roger Wood from Shearson, who was preparing the Placement Memorandum, discussed Casablanca's progress towards its 1989 projections with Burton. However, Wood only stated that he discussed Casablanca's progress with all of Casablanca's management, including Burton, and the substance of Burton's contributions is not explained. In addition, the Investors concede there is no evidence that Burton even reviewed the Placement Memorandum himself.

Regarding omissions, Burton intermittently received the "Open Sales Order" reports and "Tuesday" reports, which revealed that April and May sales were below projections. Burton stated that, by June 15, "it was a concern" that the fiscal 1989 sales projections would not be met. However, the Investors fail to argue that Burton, as an individual, had a duty to disclose. Given that the Investors have failed to introduce any evidence that they even had contact with Burton on anything relevant to the debenture offering, there is no basis for a determination that Burton had assumed a relationship of trust and confidence with the Investors. Similarly, as the Investors have not shown that they had any meaningful discussions with Burton, their claim that they relied on him fails as well.

In sum, the Investors have failed to show an issue of material fact to get them over two crucial hurdles—actionable misrepresentations or omissions and reliance—to a successful Rule 10b–5 claim against either GE Capital or Burton.[10]

### C

The Investors also brought pendent common-law fraud and negligent misrepresentation claims against the defendants.

Regardless of whether we apply the law of the forum state—California—or the law of the state chosen in the debentures—New York—the Investors' common-law claims sink or swim with their Rule 10b–5 claim. Under New York law, justifiable reliance is an element of both common-law fraud and negligent misrepresentation. *See, e.g., Keywell Corp. v. Weinstein,* 33 F.3d 159 (2d Cir.1994); *Fane v. Zimmer, Inc.,* 927

---

9. In addition, other than the business survey, the only hard data prepared by GE Capital that the Investors could have relied on was the set of projections for Casablanca allegedly prepared by GE Capital. However, Elders Finance's Goossens stated that he did not rely on these projections.

10. The Investors also claim the district court failed to consider their claims under subparts (a) and (c) of Rule 10b–5. The viability of these claims independent of the Investors' Rule 10b–5(b) claims is questionable. *See In re MDC Hold-*

*ings Sec. Litig.,* 754 F.Supp. 785, 805–06 (S.D.Cal.1990). Regardless, the Investors have not demonstrated that GE Capital or Burton engaged in a "scheme to defraud" or any "course of business which operates as a fraud." They point only to Professor Joseph Grundfest's testimony that awareness of Casablanca's sales slump could have led to cancellation or repricing of the debentures. This speculation alone is insufficient to make out a claim under subsections (a) or (c).

F.2d 124, 130 (2d Cir.1991). The same is true under California law. *See McGonigle v. Combs,* 968 F.2d 810, 817 (9th Cir.), *cert. dismissed, Casares v. Spendthrift Farm, Inc.,* 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). As discussed above, the Investors have not raised an issue of material fact as to their reliance on either GE Capital or Burton. Therefore, the Investors' common-law claims must fail as well.

▮ The Investors attempt to recast their common-law cause of action as a claim that GE Capital and Burton were liable for *aiding and abetting* Casablanca's common-law fraud.[11] Under New York law, aiding and abetting fraud requires a showing that the defendant "knew or intended to aid" the commission of a fraud. *National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 511 N.Y.S.2d 626, 629 (N.Y.App.Div.), *appeal denied,* 70 N.Y.2d 604, 519 N.Y.S.2d 1027, 513 N.E.2d 1307 (1987). Mere inaction is not enough to support aider and abettor liability. *See id.* As the Investors have not shown that GE Capital or Burton took positive steps to advance any alleged fraud by Casablanca, the Investors' new spin on their common-law claims does not save them either.

## III

The Investors claim that GE Capital and Burton are secondarily liable for Casablanca's alleged Rule 10b–5 violations because they were "controlling persons" of Casablanca under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

▮ To establish "controlling person" liability, the plaintiff must show that a primary violation was committed and that the defendant "directly or indirectly" controlled the violator. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). "In general, the determination of who is a controlling person ... is an intensely factual question." *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396 (9th Cir.1993). The plaintiff need not show the controlling person's scienter or that they "culpably participated" in the alleged wrongdoing.[12] *Id.* at 1398. If the plaintiff establishes that the defendant is a "controlling person," then the defendant bears the burden of proving he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). *See Hollinger,* 914 F.2d at 1575.

Here, a material issue of fact exists as to whether a primary violation was committed by Casablanca, through its President, Holland. The district court denied Holland's motion for summary judgment on the section 10(b) claims, stating: "He signed the no material adverse change certificate. It seems to me having done that, the remaining issues of liability are one of fact that can't be resolved on summary judgment motion." Whether Holland (and Casablanca) violated Rule 10b–5 is a pending issue in the district court. The question thus becomes whether there

---

11. Although the cases the Investors cite in support of this claim are Rule 10b–5 cases, the Supreme Court recently held that there is no cause of action for aider and abettor liability under section 10(b). *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

12. As an initial matter, the Investors claim the district court applied an incorrect legal standard because it apparently believed "culpable participation" was an element of the secondary liability claim. The precise legal standard applied by the district court, either in the oral hearing on January 17, 1992, or in the Final Partial Judgment, cannot be determined. Even if the court did believe "culpable participation" was required, it also found that GE Capital and Burton did not have control over Casablanca. This finding makes the court's additional finding about their culpable participation superfluous.

are issues of material fact as to GE Capital's or Burton's control over Casablanca.

**A**

■ Regarding GE Capital, the Investors have introduced evidence that it had a strong hand in Casablanca's debenture offering. GE Capital's bridge loan to Schnitzer was conditioned on the debenture offering taking place. GE Capital, along with Schnitzer, retained Shearson to market the debentures. GE Capital may have indirectly contributed to the Placement Memorandum by working with Casablanca's management to come up with "assumptions" for their long-term projections. GE Capital had the right to select the lead investor and exercised its right to select Elders Finance. Finally, GE Capital participated in the drafting and negotiating of the Purchase Agreement.[13]

However, the Investors have not shown any of the traditional indicia of control of Casablanca in a broader sense. GE Capital had no prior lending relationship with Casablanca. GE Capital did not own stock in Casablanca prior to the closing and did not have a seat on its Board. GE Capital's bridge loan was unsecured by any of Casablanca's assets. In short, there is no evidence that GE Capital exercised any influence whatsoever over Casablanca on a day-to-day basis.

Other courts addressing this situation have been very reluctant to treat lenders as controlling persons of their borrowers. In *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986), the Eighth Circuit held that Bankers Trust Co., the lender to the primary violator, was not a "controlling person" despite the fact that it was the borrower's primary lender, had the ability to foreclose on loans, held 17–18% of the borrower's stock, and held a controlling block of its subsidiary's stock. Similarly, in *Schlifke v.*

*Seafirst Corp.*, 866 F.2d 935, 948–50 (7th Cir.1989), the Seventh Circuit held that a bank which was the lender to a primary violator was not a "controlling person" despite the fact that it had made extensive loans to the borrower and had directed the borrower to sell certain assets to meet its loan obligations.

Here, GE Capital did not come close to having the type of leverage over Casablanca which the *Metge* and *Schlifke* courts found to be inadequate to constitute control. To ignore the overall situation but to separate out specific actions undertaken by Casablanca, as the Investors would have us do, would be an unwarranted expansion of secondary liability under the securities laws. Although the Ninth Circuit has not faced the lender-borrower situation before, it has placed great weight on the overall situation in the "controlling person" inquiry. For example, in *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995), we stated that whether a person is a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* at 1382 (internal quotation marks omitted). We did not inquire into the defendant's involvement in an isolated corporate action. *See id.; see also Arthur Children's Trust*, 994 F.2d at 1397. Similarly, in *Hollinger*, 914 F.2d at 1572 n. 16, we cited the SEC's definition of "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. As the definition suggests, our inquiry must revolve around the "management and policies" of the corporation, not around discrete transactions.

---

**13.** The Investors also submitted the testimony of Professor Joseph Grundfest, a former SEC Commissioner, that GE Capital was a "controlling person" of Casablanca in the debenture transaction for the following reasons: (1) GE Capital required the sale of the debentures and required that the terms of sale be subject to its approval; (2) GE Capital received all of the proceeds from

the sale of the debentures; (3) GE Capital had a contractual right, after the closing, to obtain options convertible to up to 60% of Casablanca's shares if no debentures were sold; and (4) GE Capital had a contractual right through two pledge agreements to vote or to sell 100% of Casablanca's shares in the event of a default under the bridge loan agreement.

GE Capital did not exercise control over the "management and policies" of Casablanca, nor did it direct its day-to-day affairs in any sense. As we hold that at least some indicia of such control is a necessary element of "controlling person" liability, the Investors cannot sustain a secondary liability claim against GE Capital.

**B**

 Our analysis of Burton's control over Casablanca shifts perspective from the lender-borrower relationship to the director-corporation relationship. "[A]lthough a person's being an officer or director does not create any *presumption* of control, it is a sort of red light." *Arthur Children's Trust*, 994 F.2d at 1396 (quoting 4 Loss & Seligman, *Securities Regulation* 1724 (1990)) (emphasis in Loss & Seligman).

Burton founded Casablanca in 1974, sold it for $30 million in 1981, and returned as CEO and Chairman in 1985. According to a management consultant's report, Holland, Clark, and Ward "manage[d] the company on a day-to-day basis without Burton." However, Burton was "at least consulted on every major decision." By way of summary, the report stated: "Burton is the classic conceptualizer and idea man who leaves behind a long swath of details for someone else to handle."

With respect to Burton's control over the debenture offering itself, Burton was Chairman at the time, even after the leveraged buyout. However, Burton was not authorized by Casablanca to act on its behalf in the debenture offering, even though the other officers of the corporation were. Burton knew the debenture offering was taking place, and he understood that the Placement Memorandum "was a disclosure of what the company was all about, were going to do, or whatever private investors want to understand about the company." However, Burton stated that he did not read the Placement Memorandum himself. At 500 pages, he thought it was too long and too complex. Instead, he gave the Placement Memorandum to Holland to review for accuracy.

In August 1988, Burton did assist Holland and Clark in developing Casablanca's sales projections for fiscal year 1989. However, at the time, there was no way Burton could be aware that the projections would be used in the Placement Memorandum six months later. In addition, Roger Wood from Shearson, who was preparing the Placement Memorandum, did discuss Casablanca's "progress towards its 1989 projections" with Casablanca's management, including Burton. The substance of Burton's contributions is not explained, however. In sum, even in a favorable light, the Investors' evidence of Burton's involvement in the debenture offering is slim.

We find guidance on this question from two other cases addressing an officer or director's status as a "controlling person." In *Arthur Children's Trust*, 994 F.2d 1390, we held that defendant Keim, an officer of the corporation, was a "controlling person" because: (1) he was a member of the Management Committee, which made all significant business decisions; (2) the Committee specifically had the authority to issue the securities which were at issue; (3) the terms of the securities were determined by the Committee; and (4) he was a vocal and active participant on the Committee. *Cf. Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440–42 (9th Cir.1987) (treating officers of a corporation as controlling persons where they "had direct involvement not only in the day-to-day affairs of Tandem in general but also in Tandem's financial statements in particular"). By contrast, in *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir.1984), this court held that defendant Schrock, a director of the corporation, was not a controlling person because: (1) he was not involved in the corporation's day-to-day business, and (2) he had nothing to do with the preparation of the prospectuses which were at issue.

On a spectrum, Burton's position is much closer to that of the director in *Burgess* than to that in *Arthur Children's Trust*. The Investors have introduced some evidence that Burton was involved in the management of Casablanca, at least on major decisions. However, they have introduced no evidence that Burton exercised direct or indirect control over the debenture offering in any way. Burton was not authorized to act for Casa-

blanca on the matter and was not involved in the preparation of any of the offering materials. Nor have the Investors submitted any evidence that Burton ever discussed the debenture offering with them.

In addition, the same facts that show Burton's control over Casablanca was less than absolute are sufficient to prove his good faith defense as a matter of law in this case. Burton knew that there was a debenture offering, but the Investors have not introduced evidence that he was involved in its workings in any significant way. Thus, Burton did not "directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). *See Kaplan*, 49 F.3d at 1382–83 (holding that the CEO of small company had proved good faith by submitting an uncontradicted affidavit stating that he never directed anyone to make misstatements that he knew to be misleading).

In sum, although the relationships between Casablanca and GE Capital and Casablanca and Burton differed, the result is the same— neither GE Capital nor Burton were "controlling persons."

## IV

The choice-of-law clause in the debentures provides:

> This Debenture shall be construed in accordance with and governed by the laws of the State of New York, without giving effect to the principles of conflicts of laws thereunder.

The district court held that New York law governed the dispute and precluded the Investors' Oregon Securities Law claims against all of the defendants.[14]

■ The first step in interpreting the clause is to apply the correct choice-of-law rules. In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state—in this case, California. *SEC v. El-*

*mas Trading Corp.*, 683 F.Supp. 743, 747–49 (D.Nev.1987), *aff'd without opinion*, 865 F.2d 265 (9th Cir.1988); *see In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1491–92 (9th Cir. 1985) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941)). The California Supreme Court's most recent statement on the issue is *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992). In that case, the court held that a choice-of-law clause is binding on the parties to a contract unless: (1) the chosen state does not have a substantial relationship to either the parties or the transaction; or (2) application of the chosen state's law would be contrary to a fundamental policy of a state with a materially greater interest in the particular issue. *See id.* at 1152 (adopting Restatement (Second) of Conflict of Laws § 187 (1971)).

■ The parties do not dispute that there is a substantial relationship between the transaction and New York. Thus, the issue is whether application of New York law would violate a fundamental policy of Oregon (and, if so, whether Oregon has a materially greater interest in the action). Before reaching this issue, however, there is a threshold question: Does the choice-of-law clause apply to claims against GE Capital, a party that did not sign the debentures?

The Investors argue that the defendants cannot invoke the choice-of-law clause because they did not sign the debentures, in which the clause appears, or the Purchase Agreement, which also provided the terms of the debenture offering. GE Capital responds that the debentures must be read together with the other transaction documents, several of which GE Capital did sign, and construed as a single agreement. GE Capital relies on the line of cases that enunciate the following principle of contract interpretation: "Documents that relate to the same subject matter and that were executed as part of the same transaction are construed

---

14. The Investors could not bring a comparable claim under New York law as there is no private right of action under the New York Blue Sky Laws. *Vermeer Owners, Inc. v. Guterman*, 78 N.Y.2d 1114, 578 N.Y.S.2d 128, 585 N.E.2d 377, 378 (1991).

as part of the same instrument." [15] *Parker v. BankAmerica Corp.*, 50 F.3d 757, 763 (9th Cir.1995). "This rule of interpretation applies even though the parties executing the contracts differ, as long as the several contracts were known to all the parties and were delivered at the same time to accomplish an agreed purpose." *Dakota Gasification Co. v. Natural Gas Pipeline Co. of Am.*, 964 F.2d 732, 735 (8th Cir.1992) (internal quotation marks omitted), *cert. denied,* 506 U.S. 1048, 113 S.Ct. 965, 122 L.Ed.2d 121 (1993). As GE Capital points out, the debentures were executed at the same time as the other deal documents, and Section 9.24 of the Purchase Agreement also incorporates by reference the "exhibits and schedules hereto and the documents and instruments referred to herein." [16] However, the principle of interpretation GE Capital relies upon is simply that—a principle of *interpretation*—and does not mean that contemporaneously executed documents somehow become a single unified contract binding all signatories to all provisions, as GE Capital seems to suggest.

▉ A choice-of-law clause, like an arbitration clause, is a contractual right and generally may not be invoked by one who is not a party to the contract in which it appears. *See Britton v. Co-op Banking Group,* 4 F.3d 742, 744 (9th Cir.1993). There are exceptions to this rule, however. In the analogous situation of arbitration clauses, we have held that "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles." *Letizia v. Prudential Bache Sec., Inc.,* 802 F.2d 1185, 1187 (9th Cir.1986).[17]

In *Britton,* 4 F.3d 742, the plaintiffs had signed a contract, which contained an arbitration provision, with a corporation. The defendant corporate officer, who had not signed the contract, sought to invoke the arbitration clause against the plaintiffs. This court held that, because he was not a party to the contract, the defendant could not invoke its protections unless he fit into one of three categories: a third-party beneficiary to the contract, a successor in interest to the contract, or an agent intended to benefit from the clause. *See id.* at 745–48. On the third category, the court applied principles of agency law and looked at whether any of the defendant's alleged wrongdoing as an agent or officer of the corporation related to the contract containing the arbitration provision. Although the officer was an agent of the corporation, his alleged wrongdoing was unrelated to any provision or interpretation of the contract, and the court held that he had no standing to compel arbitration.

Applying *Britton*'s analysis to this case, GE Capital does not fit into any of the three categories. There is no indication in the debentures that GE Capital was a third-party beneficiary [18] (or a successor in interest), and GE Capital would be the last to argue that it was Casablanca's agent (or vice versa) in the debenture offering, as this would cut against its "controlling person" arguments.

As for Burton, he was the Chairman of Casablanca at the time of the debenture offering and thus would be Casablanca's agent in most matters and would potentially be able to invoke the choice-of-law clause. However, as noted above, Burton was not authorized by Casablanca to act on its behalf in the debenture offering. Nor did Burton

---

**15.** This principle of contract interpretation is equally applicable under New York or California law. *See Gordon v. Vincent Youmans, Inc.,* 358 F.2d 261, 263 (2d Cir.1965) (applying New York law); *Heston v. Farmers Ins. Group,* 160 Cal. App.3d 402, 206 Cal.Rptr. 585, 594 (1984).

**16.** Neither the list of Exhibits nor the list of *Schedules contained in the debentures* specifically references a contract signed by both GE Capital and the Investors. The only contract which GE Capital and the Investors both signed, the Option Holders Agreement, contains a *California* choice-of-law clause governing the contract.

**17.** This rule is "an outgrowth of the strong federal policy favoring arbitration." *Letizia,* 802 F.2d at 1187. The policy in favor of recognizing parties' contractual choice-of-law clauses is also generally considered to be strong. *See, e.g., Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2d Cir.1991).

**18.** "[T]he law requires a showing that the *parties to the contract* intended to benefit a third party." *Britton,* 4 F.3d at 745. Here, § 9.19 of the Purchase Agreement clearly indicates that the parties "do not intend the benefits of this Agreement to inure to any third party."

as a practical matter act as if he were an agent of Casablanca; as Burton himself argued in the context of the "controlling person" claims, his involvement in the transaction was minimal. In short, there is no indication that Burton was an agent intended to benefit from the choice-of-law clause.

In sum, GE Capital and Burton, nonsignatories to the contract in which the choice-of-law clause appears, cannot shield themselves with its protections. Therefore, the district court erred in holding that the New York choice-of-law clause precludes the Investors' Oregon Securities Law claims.[19] Nevertheless, we affirm the district court's dismissal of the Investors' Oregon Securities Law claims against GE Capital and Burton substantially for the reasons expressed in Parts II and III with respect to the federal securities law claims. *See Trimble v. City of Santa Rosa,* 49 F.3d 583, 584 (9th Cir.1995) ("we may affirm on any ground supported by the record").

 Since the Investors have failed to show a genuine issue of material fact regarding actionable misrepresentations or omissions, and since neither GE Capital nor Burton was a "controlling person," we conclude that the Investors are unable to make successful claims under O.R.S. § 59.115. *See Shivers v. Amerco,* 670 F.2d 826, 831 (9th Cir.1982) ("Since ... Oregon ... chose to enact laws paralleling Rule 10b–5, we think it only logical that [it] intended [ORS § 59.115] to be interpreted consistently with the federal rule."); *Badger v. Paulson Inv. Co., Inc.,* 311 Or. 14, 803 P.2d 1178, 1182 (1991) (discussing Oregon's "controlling person" provision in context of federal securities law); *Karsun v. Kelley,* 258 Or. 155, 482 P.2d 533, 536 (1971) ("In 1967 the Oregon Blue Sky Law was amended by ORS 59.115(1)(b) to adopt substantially the same terms as set forth in the Federal Security Act of 1933, 15 U.S.C.A. § 77l (2).").

## V

Section 9.9 of the Purchase Agreement, signed by the Investors, provides:

> The Company and Purchasers each hereby irrevocably waive any right it may have to trial by jury in any action, suit, counterclaim or proceeding arising out of or relating to this agreement or any Debenture or any other document executed in connection therewith.

During the proceedings below, the defendants moved to strike the Investors' jury demand. In its Order on Motions, the district court held that the Investors had waived their right to a jury trial against all defendants.

 The Investors again argue that the defendants cannot invoke the jury waiver clause because they were not parties to the Purchase Agreement or the debentures. As with the choice-of-law clause, a jury waiver is a contractual right and generally may not be invoked by one who is not a party to the contract.[20] *See Britton,* 4 F.3d at 744. And, as with the choice-of-law clause, ordinary contract and agency principles do not provide GE Capital or Burton with standing to invoke the jury waiver.[21] The Purchase Agreement is no different than the debentures themselves in this respect. Therefore, we reverse the order waiving jury trial.

## VI

Count V of the Investors' Complaint stated a claim, under the heading "Unjust Enrich-

---

**19.** O.R.S. § 59.115(1)(a) imposes liability against any person who "[s]ells a security in violation of the Oregon Securities Law." O.R.S. § 59.115(1)(b) makes a person liable for selling a security "by means of an untrue statement of a material fact." O.R.S. § 59.115(3) provides for derivative liability of every nonselling person who (a) "directly or indirectly controls a seller," and (b) "every person who participates or materially aids in the sale." *See Badger v. Paulson Inv. Co., Inc.,* 311 Or. 14, 803 P.2d 1178, 1181 (1991).

**20.** The only document to which both GE Capital and the Investors are signatories, the Option Holders Agreement, also contains a jury waiver, though it is limited to disputes arising out of that document or the options which are its subject.

**21.** Unlike arbitration clauses, courts generally construe jury waivers narrowly. *See, e.g., Pradier v. Elespuru,* 641 F.2d 808, 811 (9th Cir.1981). Thus, we are even more hesitant to extend the protections of the jury waiver clause to a nonsignatory.

ment," for "equitable subrogation to any and all rights GE Capital has as against Casablanca." The district court dismissed the Investors' claim, stating:

> I think the relationships among the parties are really governed by the written agreements, by general principles of fraud connected with the execution and performance of the agreements, and by state and federal securities laws. And I don't think that the broader principles of equity—of unjust enrichment . . . can control over these more specific legal applications.

On appeal, the Investors claim that GE Capital is liable for restitution "for the significant additional value of its enhanced seniority and security."

Under both California and New York law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties. *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1272 (S.D.N.Y.1991) ("Unjust enrichment is a quasi-contract claim, and the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the subject matter.") (internal quotation marks omitted); *see Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co.,* 183 A.D.2d 758, 583 N.Y.S.2d 497, 498 (App.Div.1992). *Accord Wal–Noon Corp. v. Hill,* 45 Cal.App.3d 605, 613, 119 Cal.Rptr. 646 (Ct.App.1975). Here, the subject matter of the Investors' dispute—the debenture offering—is covered by several valid and enforceable written contracts. The particular subject matter of this claim—the Investors' rights to subrogation on GE Capital's position vis-a-vis Casablanca—is also covered by contract. Section 1.2 of the debentures provides that the right to payment of principal or interest on the debentures is "expressly made subordinate and subject in right of payment . . . to the prior payment in full . . . of the Senior Loan [between GE Capital and Casablanca]." This provision expressly precludes the type of subrogation sought by the Investors—having their rights to payment from Casablanca put ahead of, or on a par with, GE Capital's. As the Inves-

tors' rights to payment in relation to other obligations of Casablanca are squarely set out in the debentures, their unjust enrichment claim is precluded.

The Investors argue that they had no valid contract with GE Capital governing their rights to subrogation. Although GE Capital did not sign either the Purchase Agreement or the debentures, the Investors' unjust enrichment claim is governed by contract because (1) the debentures were executed contemporaneously with other deal documents to which GE Capital was a party, (2) the Purchase Agreement and debentures cross-reference these documents, and (3) the parties were well aware that the documents were all part of the debenture transaction. Unlike the choice-of-law and jury waiver clauses, the debentures cover the Investors' rights vis-a-vis GE Capital on this particular issue. Section 1.2 expressly sets out the Investors' rights to payment in relation to other obligations of Casablanca, including the Senior Loan made by GE Capital.

## VII

The above discussion has been virtually silent as to one of the defendants in this action, Jordan Schnitzer. This is so because the Investors have failed to present any arguments as to his involvement in the debenture offering.

Schnitzer argues that (1) the Investors waived their right to challenge on appeal the summary judgment in his favor when they consented to entry of judgment on the section 10(b) and common-law claims, and (2) the Investors abandoned these claims by failing to make arguments in their opening brief.

Because the district court had previously granted summary judgment for the other defendants on the section 10(b) and common-law claims, the Investors filed a "statement of non-opposition" to Schnitzer's motion for summary judgment on these claims. In its Order on Motions, the district court stated: "Plaintiffs do not oppose Schnitzer's motion . . ., but without waiving plaintiffs' right to preserve the issues for appeal. Plaintiffs' non-opposition is accepted by the court on

that basis...." This holding is substantially repeated in the Final Partial Judgment.[22]

In support of his argument that the Investors are barred from challenging the summary judgment in his favor, Schnitzer relies on the line of cases that hold that an issue will not be heard for the first time on appeal. *See, e.g., Image Technical Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 615 n. 1 (9th Cir.1990), *aff'd,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). However, this is a case where the Investors consented to entry of summary judgment by the district court, not a case where they failed to raise a particular argument in opposition. In the analogous situation of consent judgments, we have "followed the practice of looking at the language of the consent judgment and other evidence in the record to determine whether a party may appeal following an order entered by consent." *Blair v. Shanahan,* 38 F.3d 1514, 1521 (9th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1698, 131 L.Ed.2d 561 (1995); *see also Shores v. Sklar,* 885 F.2d 760, 762 (11th Cir.1989) ("The law is clear that consent to entry of judgment without reservation of the right to appeal a particular claim bars an appeal."), *cert. denied,* 493 U.S. 1045, 110 S.Ct. 843, 107 L.Ed.2d 838 (1990). Here, it is clear that at least the Investors and the district court believed they had reserved the right to appeal. The bigger problem, however, is that the Investors failed to make their arguments on appeal.

"It is well established in this Circuit that claims which are not addressed in the appellant's brief are deemed abandoned." *Collins v. City of San Diego,* 841 F.2d 337, 339 (9th Cir.1988). The Investors make no argument whatsoever that there are issues of material fact regarding Schnitzer's liability for violations of section 10(b) or for the common-law

claims. The only relevant mention of Schnitzer in the Investors' opening brief is the Investors' concession that their arguments pertain only to GE Capital and Burton and not to Schnitzer.[23] Thus, the Investors' section 10(b) and common-law claims against Schnitzer must be deemed abandoned.

## VIII

For the above reasons, we hold that summary judgment was properly granted for GE Capital and Burton on both the Investors' primary liability claims under section 10(b) and Rule 10b–5 and their secondary liability claims under section 20(a). Although we hold that the district court erred in concluding that the New York choice-of-law clause precludes the Investors' Oregon Securities Law claims, we affirm the district court's dismissal of the Oregon Securities Law claims. We also hold that summary judgment was properly granted for GE Capital on the Investors' unjust enrichment claims. We hold that the Investors have abandoned their claims against Schnitzer. Finally, we hold that the district court erred in enforcing the jury waiver clause. The Final Partial Judgment of the district court is therefore affirmed in substantial part, reversed only with respect to the jury waiver issue, and remanded.

AFFIRMED in substantial part, REVERSED in one respect, and REMANDED. Each side to bear its own costs.

---

**22.** The Investors now claim that the court's entry of judgment was "technically in error, and the court should have left those claims unresolved pending appeal." However, the Investors themselves consented to entry of judgment for Schnitzer. If they later decided they did not like the judgment, they could have filed a motion under Rule 60 of the Federal Rules of Civil Procedure for relief from that portion of the judgment. As the Investors did not raise this objection before the district court, they have waived it on appeal. *See Telco Leasing, Inc. v. Transwestern Title Co.,* 630 F.2d 691, 693 (9th Cir.1980).

**23.** The Investors respond that they failed to argue the claims against Schnitzer because the district court never addressed them on their merits. Of course, the reason the court did not address them on the merits is that the Investors consented to entry of summary judgment. To allow the Investors to keep Schnitzer in this litigation at this point would be to drag him along as a defendant even though arguments establishing his liability have never been advanced.