### In re CENDANT CORPORATION SECURITIES LITIGATION.

This document relates to

**William P. Yeager and Virginia I. Yeager, Co–Trustees of the William P. Yeager and Virginia I. Yeager Trust, Plaintiffs,**

v.

**Cendant Corporation, et al., Defendants.**

**No. CIV. A. 98–1664.**

United States District Court, D. New Jersey.

Aug. 9, 2000.

Joel M. Kozberg, Gradstein, Luskin & Van Dalsem, Los Angeles, CA, Robert Lewin, Stroock & Stroock & Lavan, New York City, for Plaintiffs William P. Yeager and Virginia I. Yeager, Co–Trustees of William P. Yeager and Virginia I. Yeager Trust.

Michael M. Rosenbaum, Carl Greenberg, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, Jonathan J. Lerner, Samuel Kadet, Joseph N. Sacca, Skadden, Arps, Slate, Meagher

& Flom LLP, New York City, for Defendant Cendant Corp.

## OPINION

WALLS, District Judge.

## INTRODUCTION

Plaintiffs William P. and Virginia I. Yeager, co-trustees of the William P. Yeager and Virginia I. Yeager Trust (collectively "Yeager plaintiffs"), move for partial summary judgment that defendant Cendant[1]: 1) violated Section 11 of the Securities Act of 1933 ("Securities Act") and is liable to plaintiffs for $15,849,680.92 plus interest (Count 1); 2) violated Section 12(a)(2) of the Securities Act (Count 5); 3) violated Rule 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated thereunder (Count 7); and 4) violated Section 14a of the Exchange Act and Rule 14a–9 promulgated thereunder (Count 12). The court heard oral argument on July 31, 2000.

The facts underlying this action are fully set forth in this court's December 13, 1999 opinion which granted in part and denied in part defendants' motion to dismiss the Yeagers' complaint. *See* 190 F.R.D. 331 (D.N.J.1999). Briefly, the Yeagers acquired 1,109,854 shares of common stock of defendant Cendant Corporation in exchange for 461,847 shares of HFS Incorporated in the December 1997 merger of CUC International, Inc. and HFS. Soon after the oft-discussed April 1998 mea culpas by Cendant, *see e.g. In re Cendant Corp. Litigation,* 182 F.R.D. 144 (D.N.J. 1998), and 60 F.Supp.2d 354 (D.N.J.1999), the Yeagers began to sell off their Cendant holdings; they had fully divested their Cendant shares by July 1998. Yeager Br. at 12.

These plaintiffs' securities law claims, addressed in this opinion, arise from public documents generated by CUC, HFS and Cendant: 1) a Registration Statement filed by HFS and CUC with the SEC on August 28, 1997; 2) a Joint Proxy Statement/Prospectus, also filed by HFS and CUC with the SEC on August 28, 1997, and distributed to HFS shareholders, including plaintiffs, on August 29, 1997. The Yeagers also rely on documents created after the disclosures of fraud, during the investigation and litigation that followed: 3) an Audit Report, filed with the SEC in Cendant's August 28, 1998 form 8–K, presented to Cendant's Audit Committee by the law firm Willkie Farr & Gallagher and accounting/consulting firm Arthur Anderson LLP; and 4) Cendant's cross-claim and amended cross-claim against CUC's long-time auditors Ernst & Young LLP, filed August 19, 1999 and June 19, 2000, respectively.

## DISCUSSION

1. *Standard for Summary Judgment*

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

---

1. Plaintiffs' complaint named numerous defendants, but by this motion, the Yeagers move against only the corporation Cendant.

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3rd Cir.1976), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Wahl v. Rexnord, Inc.* 624 F.2d 1169, 1181 (3rd Cir.1980).

### 2. *Section 11*

■ Plaintiffs request summary judgment, as to both liability and damages, under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a). Under Section 11, purchasers of registered securities may sue enumerated individuals for materially false or misleading information included in, or the omission of material information from, the registration statement. Plaintiffs may meet their prima facie burden by showing only a material misstatement or omission. Notably, "[l]iability against the issuer of a security is virtually absolute," *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), so that plaintiffs need not demonstrate scienter. *Id.; In re Cendant Corporation Litigation*, 60 F.Supp.2d 354, 363 (D.N.J. July 27, 1999).

Plaintiffs contend that misstatements in the August 1997 registration statement, particularly concerning CUC's fraudulently reported earnings, "would have been viewed by the reasonable investor as having altered the 'total mix' of information made available," and are therefore material as a matter of law. *See In re Donald J. Trump Casino Sec. Litigation–Taj Mahal Litig.*, 7 F.3d 357, 369 (3rd Cir.1993) (citation omitted). Though materiality is "a relative concept," *id.*, Cendant does not deny that the representations in the registration statement were material, and this court finds no reason to reject the parties' assertions on the point.

Recognizing the "relatively minimal burden" on a Section 11 plaintiff, *see Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. 683, Cendant apparently concedes liability. *See* Cendant Br. at 11 (arguing that plaintiffs' motion for summary judgment on Section 11 claims should be denied—but only to the extent plaintiffs seek "rote application" of the statutory damages measure). However, the corporation invokes the statutory defense of "negative causation," *see* 15 U.S.C. § 77k(e). Under this provision, "if the defendant proves that any portion or all of [plaintiffs'] damages represents other than the depreciation in value of such security resulting from [the misstatements or omissions in] the registration statement," its liability is reduced or eliminated. *Id.* By the plain language of the statute, defendant bears the burden of proof on this affirmative defense. *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 341 (2nd Cir.1987); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1048 (2nd Cir.1995).

The Yeager plaintiffs calculate Section 11 damages according to 15 U.S.C. § 77k(e), which allows recovery of "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and ... (2) the price at which such security shall have been disposed of in the market before suit." Plaintiffs evidence that they exchanged 461,847 shares of HFS common stock, worth $35,764,277.06 at closing on the day before the merger; in return, they received 1,109,864 CUC/Cendant shares

and $16.05 cash. Yeager Decl. ¶¶ 2–3, Yeager Appendix Exhs. 14, 16, 17. After Cendant's disclosures of fraud, the Yeagers sold all of their Cendant stock between May 19 and July 15, 1998, for total proceeds of $19,914,580.09. Yeager Decl. ¶ 4, Yeager Appendix Exh. 18. Plaintiffs request $15,849,680.92 in damages, which represents the difference between the value of the HFS shares they traded in, and the selling price received in May and June 1998. They also seek prejudgment interest. *See Feather v. United Mine Workers of America,* 711 F.2d 530, 540 (3rd Cir. 1983).

Cendant seeks to reduce that figure, relying on the declaration of financial economist Dr. Marcia Kramer Mayer. Dr. Mayer, a specialist in securities and financial economics, opines that plaintiffs have "fail[ed] to account for the fact that a substantial portion of the decline in Cendant's stock price between the time of the acquisition of their shares and the times of their sales of these shares was attributable to factors other than the accounting irregularities and errors." Mayer Decl. ¶ 9. Her statistical "event study," which assesses the reaction of Cendant's stock price to each public disclosure of accounting irregularities, purports to evaluate the amount of artificial inflation per share (the portion of the price attributable to the alleged misstatements) on various dates. *Id.* ¶¶ 19–23. For example, Dr. Mayer finds that Cendant's April 15, 1998 disclosure reduced artificial inflation to $6.40 (down from $13.39 at the time of the merger), and that the company's July 14, 1998 disclosure eliminated all remaining artificial inflation. *Id.* ¶ 25 and Exh. 7. She concludes that, though the Yeager plaintiffs sustained actual losses of between $9.63 to $16.50 on their Cendant sales, only $6.99 of the May and June 1998 losses, and $13.39 of the July losses, are attributable to misstatements in Cendant's financials. "The

remainder is attributable to other factors, such as (but not limited to) changes in general market and industry conditions." *Id.* ¶ 26 and Exh. 7.

Such statistical evidence is sufficient to create a triable issue of fact on the negative causation issue, as to the amount of appropriate damages. *See, e.g., Akerman,* 810 F.2d at 342. Whether Cendant can prove its assertion that causes other than the misstated financials contributed to plaintiff's losses remains to be seen at trial. *See Collins v. Signetics Corp.,* 605 F.2d 110, 115 (3rd Cir.1979) (affirming jury verdict for defendant based on corporate defendant's expert testimony that various economic and political factors caused a market decline, including "high interest rates, inflation, the war in the Middle East, Watergate, Vice President Spiro Agnew's resignation, a large verdict against International Business Machine Corporation, the oil embargo and subsequent long lines at gasoline stations, closing of large automobile plants, President Nixon's resignation, United States–Soviet confrontations, and shortages and fears of shortages in general"), *overruled on other grounds, Pinter v. Dahl,* 486 U.S. 622, 644, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

Yet, as noted by plaintiffs, Cendant's own expert admits that at least some of the Yeagers' losses, $11,661,078.96,[2] can be traced directly to the registration statement. Mayer Decl. ¶ 26. Because Cendant does not dispute its Section 11 liability, plaintiff's request for partial summary judgment as to liability is granted; because Cendant concedes $11,661,078.96 in damages, plaintiffs are entitled to summary judgment as to that amount on their Section 11 claims.

3. *Section 12(a)(2)*

Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l* (a)(2), provides:

> lenged that figure, admitting only $11,661,-078.96. Plaintiffs did not respond; the court therefore accepts the lower figure.

**2.** In their briefs, plaintiffs calculate defendant's admitted damages at $11,812,117.88, purportedly based on Dr. Mayer's calculations. At oral argument, defendant chal-

Any person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus ... which includes an untrue statement of material fact ... (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him ... for damages if he no longer owns the security.

To warrant summary judgment, plaintiffs must establish a lack of disputed issues concerning Cendant's offering of shares by means of a prospectus which contained material misstatements of fact. *In re MobileMedia Securities Litig.,* 28 F.Supp.2d 901, 933 (D.N.J.1998). The legal standard for materiality under this provision is the same as under Section 11. *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d at 369.

The Yeagers contend that they have evidenced these elements: they were offered stock by means of the Joint Proxy Statement/Prospectus, and the Joint Proxy Statement/Prospectus contained material misstatements concerning CUC's financial performance for the years ended January 31, 1996 and January 31, 1997, and the quarters ended April 30, 1997 and July 31, 1997. Yeager Br. at 31. Cendant does not challenge these assertions. *See, e.g.,* Cendant Response to Plaintiffs' First Set of Requests for Admission, Yeager Exh. 4 ¶¶ 33, 40 ("Cendant admits that the Joint Proxy Statement was inaccurate in certain material respects ... ").

Summary judgment is granted to the Yeager plaintiffs on their claims under Section 12(a)(2) of the Securities Act.

### 4. *Section 10(b) and Rule 10b–5*

The parties debate Cendant's liability under Section 10(b) of the Exchange Act,

15 U.S.C. § 78j(b), and Rule 10b–5, which make it illegal:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. To prove such a claim, plaintiffs must show that Cendant, in connection with the purchase or sale of a security, (1) misrepresented or omitted (2) a material fact (3) with knowledge or recklessness (scienter), and (4) reasonable reliance by plaintiffs with (5) consequent injury. *In re Advanta Corp. Securities Litig.,* 180 F.3d 525, 537 (3rd Cir.1999); *see also Kennilworth Partners L.P. v. Cendant,* 59 F.Supp.2d 417, 427 (D.N.J. Aug.10, 1999).

Here the major disputed element is that of scienter. Plaintiffs contend that Cendant has admitted facts which incontrovertibly establish this element, relying on the doctrine of judicial admissions: "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,* 976 F.2d 58, 60 (1st Cir.1992). A party will be held to its unambiguous and plainly worded statements, "deliberately drafted by counsel for the express purpose of limiting and defining the facts at issue"; however, "to be binding, judicial admissions must be unequivocal." *See Airco Indus. Gases, Inc. Div. of the BOC Group, Inc. v. Teamsters Health and Welfare Pension Fund,* 850 F.2d 1028, 1036 (3rd Cir.1988); *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3rd Cir.1972).

■ As evidence, plaintiffs first attempt to bind Cendant to representations in its August 1999 cross-claim against Ernst & Young ("E & Y"), to the effect that CUC's Chief Financial Officer Cosmo Corigliano and Senior Vice President/Controller Anne Pember directed other CUC personnel to engage in four major categories of "accounting irregularities": inflation of pretax operating income ("topside adjustments"), inappropriate reversal of merger reserves, improper revenue recognition, and understatement of membership cancellation reserves. Yeager Br. at 34–35, quoting Cross–Claim ¶¶ 76–80. That pleading has since been superseded; the Yeager plaintiffs now rely on Cendant's amended cross-claim dated June 19, 2000, that:

- The illegal scheme to report nonexistent income to meet Wall Street's targets was an "ingrained part of the CUC corporate culture" (¶ 17);
- The fraud lasted at least 11 years, beginning in 1986 (¶ 13);
- "The participants in the illegal scheme included virtually the entire senior management of CUC, including but not limited to its former chairman and chief executive officer Walter Forbes, its former president Kirk Shelton, and two of its former chief financial officers, Stuart Bell and his successor Cosmo Corigliano. Various middle-level managers at CUC also became involved in carrying out this scheme, including but not limited to Anne Pember, its former senior vice president and controller, and Casper Sabatino, its former vice president of accounting and financial reporting" (¶ 14), as did Chris McLeod, president of the Comp–U–Card division (¶ 19); and
- "The goal of [the] illegal scheme was to ensure that CUC always met Wall Street's growing earnings expectations for the company. Wall Street analysts regularly released expectations for CUC's earnings, as they do

for many publicly-traded companies. CUC's senior management knew that meeting or exceeding these expectations was a key factor for the stock price of any publicly-traded company and therefore set out to ensure that the company met Wall Street's targets every year regardless of the company's actual earnings." (¶ 13).

Cendant's Amended Cross–Claim, Suppl. Kozberg Decl. Exh. 1. Plaintiffs rely on these representations, the binding effects of which are not disputed by Cendant, to show that "nearly the entire senior management of CUC acted with scienter when they intentionally and fraudulently overstated CUC's reported income in order to manipulate CUC's stock price." Yeager Reply Br. at 8.

Plaintiffs further rely on the Audit Report, to which Cendant repeatedly referred in response to plaintiffs' requests for admissions during discovery. *See* Yeager Appendix Exh. 4. When asked whether the Audit Report accurately describes accounting irregularities at CUC for the years 1995, 1996 and 1997, Cendant responded:

> After a reasonable inquiry, Cendant believes the information known by or readily available to Cendant is insufficient to enable Cendant to admit or deny this Request. However, Cendant has no reason to believe that the Audit Report fails to accurately describe CUC's accounting irregularities during the relevant time periods discussed therein.

*See* Cendant's March 2000 Response to Plaintiffs' First Set of Requests for Admission, Yeager Appendix Exh. 4, ¶ 56. Consequently, the plaintiffs characterize the Audit Report as a judicial admission, the contents of which are "conclusively established" by effect of Federal Rule of Civil Procedure 36(b) and its adoption by Cendant's Audit Committee. *See also Airco,* 850 F.2d at 1035.

Specifically, plaintiffs seek to bind Cendant to its supposed statements in the Audit Report that "numerous accounting

irregularities and improper accounting practices were *intentionally* committed in order to inflate revenues, understate expenses, and overstate CUC's (and Cendant's) operating income, income and earnings per share." (Emphasis added). Yeager Br. at 9, citing Statement of Undisputed Facts ¶ 28, citing Cendant's August 1998 Form 8–K, which contained the Audit Report as Exhibit 99.1, at 16, and Press Release, at 141–143. Further, plaintiffs charge, the Audit Report identifies Corigliano and Pember as members of the "upper echelon" of CUC's management who directed the accounting fraud. Statement of Undisputed Facts ¶ 29, citing Audit Report at 46–140.

Cendant counters by attacking plaintiffs' ratiocination. The Yeager plaintiffs argue that, because certain high-ranking corporate officers of CUC have admitted knowledge of the fraud constituting scienter, such state of mind can be attributed to present defendant Cendant. Such contention relies upon two assumptions: first, that the knowledge of the CUC employees can be attributed to their corporate employer; and second, that any scienter of CUC can be imported to its successor corporation Cendant.[3]

Regarding the first premise, Cendant argues that as a "legally distinct" corporate entity, it should not be charged with knowledge possessed by its employees. Factually, Cendant claims that the Audit Report found no knowledge of the fraud by: "any officer responsible for Cendant's day-to-day operations after the CUC/HFS merger," any member of CUC's or Cendant's Board of Directors, nor, based on the information available, CUC's two most senior executive officers Forbes and Shelton. Cendant Br. at 12–13. Though Cendant admits that the Audit Report implicated Corigliano and Pember, the corporation charges that no findings have been made as to their motives. *Id.* at 13.

Cendant relies on a line of decisions which hold that "the knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation." *Kaplan v. Utilicorp United, Inc.,* 9 F.3d 405, 407 (5th Cir.1993) (discussing Section 10(b) standing); *see also Alpern v. Utilicorp United, Inc.,* 1994 WL 682861, at *3 (W.D.Mo.1994) (in related case concerning same underlying fraud, rejecting plaintiff shareholder's argument that the knowledge of subsidiary's corporate officers could be imputed to parent corporation merely because they held high ranking positions in the company). As discussed by the *In re Jack Greenberg* court, 212 B.R. 76, 84 (Bkrtcy.E.D.Pa. 1997):

> The rule that knowledge or notice on the part of the agent is to be treated as notice to the principal is founded on the duty of the agent to communicate all material information to his principal, and the presumption that he has done so. But the legal presumptions ought to be logical inferences from the natural and usual conduct of men under the circumstances. But no agent who is acting in his own antagonistic interest, or who is about to commit a fraud by which his principal will be affected, does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature.

(referencing *Gunster v. Scranton Illuminating, Heat & Power Co.,* 181 Pa. 327, 337–38, 37 A. 550 (1897)). Plaintiffs accurately note, however, that these cases, and others advanced by Cendant, concerned misappropriation by corrupt officers of corporate funds for personal use—a situation clearly involving adverse interests. *See, e.g., In re Investors Funding Corp. of New York Securities Litig.,* 523 F.Supp. 533, 537, 540 (S.D.N.Y.1980). *Also see F.D.I.C. v. Shrader & York,* 991 F.2d 216,

---

**3.** Defendants apparently concede plaintiffs' charge that, because CUC was (simply) renamed Cendant after the HFS merger, there is no legal distinction of import here between CUC and Cendant. Reply Br. at 3 n.5.

224–25 (5th Cir.1993) (distinguishing between fraud committed by an officer against employer corporation, which is not imputed to the corporation, and fraud committed for the benefit of the corporation); *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982) (Posner, J.) (same; analyzing "underlying objectives of tort liability").

Defendant further relies on *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 884 (3rd Cir.1975) that, under general agency principles, "the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation.... The underlying reason is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business." *See also U.S. v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes, Oneida County, Wis.,* 965 F.2d 311, 316–17 (7th Cir.1992) (in drug forfeiture action, discussing corporate agency principles, intra-court variations on that theme, and the adverse agent exception).

Cendant claims that, without deposition testimony or "other direct, concrete proof" of the motives of those who authorized and implemented the accounting irregularities, a ruling that the knowledge of former employees can be imputed to the corporation would be premature. Cendant Br. at 15–16. The court agrees. At this early stage of litigation, the court is unable to answer even the preliminary question of exactly which CUC or Cendant employees were aware of the fraud. *See* Cendant Br. at 12 (asserting that Audit Report contains no finding that "any officer responsible for Cendant's day-to-day operations after the CUC/HFS merger" knew of the accounting irregularities before April 1998); *cf.* Yeager Reply Br. at 5 (alleging that Cendant has admitted the participation of CUC/Cendant directors Forbes, Shelton and McLeod, citing Cendant's Answer to Yeager Complaint ¶ 8); *cf.* Cendant Br. at 13 (claiming without citation that both Forbes and Shelton have denied knowledge of or participation in the fraud); *cf.* Yeager Reply Br. at 3–4 (citing Audit Report at 18 that Casper Sabatino, Vice President of Accounting and Financial Reporting, Kevin Kearney, Director of Financial Reporting and Controller of a CUC subsidiary, Steven Speaks, Controller of Comp–U–Card after June 1997, and Mary Sattler, Supervisor of Financial Reporting for CUC, have each admitted participation and direction in the fraud).

As for those individuals whose culpable participation is admitted, no record has yet been developed as to whether the fraud was conducted for their personal benefit or that of the corporation. The possibility of adverse interests between the guilty employees and the corporation remains open. The Western District of Pennsylvania denied summary judgment on similar facts, reasoning that although certain corporate employees had testified that "the motivation behind the fraud and resultant cover-up was to provide time for management to resolve [the corporation's] underlying business problems, such a motivation does not ... necessarily equate to a finding that the fraudulent actors intended to benefit" the corporation. *In re Phar–Mor, Inc. Securities Litig.,* 900 F.Supp. 784, 787 (W.D.Pa. 1995). "Indeed, a reasonable trier of fact could conclude that the true motive of the wrongdoers was the preservation of their employment, salaries, emoluments, and reputations, as well as their liberty, at the expense of [the corporation's] well-being." *Id.; see also In re Kidder Peabody Securities Litig.,* 10 F.Supp.2d 398, 415–417 and n. 17 (S.D.N.Y.1998) (finding evidence to support a reasonable inference of corporation's scienter where a securities analyst had openly reported hundreds of millions of dollars in false profits, but not deciding imputation issue because of dispute as to whether trader was acting adversely to corporation's interests). And in that circumstance, the determination of *Rochez*

that in securities fraud cases, respondeat superior is generally not available could prevail. *Rochez*, 527 F.2d at 886.

Plaintiffs do not benefit from *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 193 (3rd Cir.1981) which affirmed corporate liability under Section 10(b) on a theory that accounting firms owe a stringent duty to supervise their employees, and where the jury responded affirmatively to the special interrogatory, "Do you find that [a corporate employee], *acting in the scope and course of his duties as an employee of defendant*, caused with scienter ... the material misrepresentations [or] the material omissions?" (Emphasis added). That narrow interrogatory begs our issue— namely, whether the corporate officers here acted in the scope and course of their duties, and to the benefit of the corporation.

As in *Phar–Mor*, such material factual controversy can be resolved only by a trial fact finder. That said, it is also noted that the Private Securities Litigation Reform Act of 1995 requires the fact finder to ultimately determine the percentage of responsibility of each person putatively involved, "measured as the percentage of total fault of all persons who caused or contributed to the loss incurred by plaintiff," and "[w]hether such person knowingly committed a violation of the securities laws." 15 U.S.C. § 78u–4(f)(3)(A)(ii)–(iii). Plaintiffs' motion for summary judgment on their Section 10(b) and Rule 10b–5 claims is denied without prejudice.

### 5. *Section 14(a)*

Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), makes it unlawful for "any person ... to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any [registered] security" in contravention of SEC rules. In turn, SEC Rule 14a–9 prohibits solicitation by means of a proxy statement "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a–9.

■ Section 14(a) is analogous to Section 11: each "proscribes a type of disclosure or lack of it" and "involves single specific documents which are of primary importance in two fundamental areas of securities regulation," and neither requires a showing of scienter. *Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 777–78 (3rd Cir.1976). To prove entitlement to summary judgment, plaintiffs must show that: (1) a proxy statement contained a material misrepresentation or omission which (2) caused them injury and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link in the accomplishment of the transaction." *General Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 932 (3rd Cir.1992) (citations omitted). Again, "an omitted fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Id.*

■ Plaintiffs allege that the misstatements concerning CUC's financial status in the Joint Proxy/Prospectus were indisputably material. They further assert that the proxy solicitation was an "essential link" in the chain of events leading up to the merger because shareholder approval, secured by means of the Joint Proxy/Prospectus, was a condition precedent to the merger's consummation. Yeager Br. at 38. Again Cendant raises no contest.

This court accepts plaintiffs' unchallenged evidence and grants summary judgment on their Section 14(a) claims.

### CONCLUSION

Summary judgment against (only) Cendant is granted in part and denied in part: Plaintiffs' motion for summary judgment of liability is granted as to their claims under Section 12(a)(2) of the Securities Act and Section 14(a) of the Exchange Act. The motion is denied without prejudice as to plaintiffs' Section 10(b) claims. Plaintiffs' motion for summary judgment on their Section 11 claims is granted as to liability; and because Cendant concedes $11,661,078.96 in Section 11 damages, partial summary judgment as to that amount of damages

is also granted.

**SO ORDERED.**

### ORDER

Plaintiffs William P. and Virginia I. Yeager, co-trustees of the William P. Yeager and Virginia I. Yeager Trust (collectively "Yeager plaintiffs"), move for partial summary judgment on certain of their federal securities law claims against solely defendant Cendant. The court heard oral argument on July 31, 2000. For the reasons stated in the accompanying opinion,

It is this day of August, 2000:

ORDERED that summary judgment against Cendant is granted in part and denied in part:

1) The Yeager plaintiffs' motion for summary judgment of liability on their claims under Section 12(a)(2) of the Securities Act and Section 14(a) of the Exchange Act is granted;

2) The motion is denied without prejudice as to plaintiffs' Section 10(b) claims;

3) Plaintiffs' motion for summary judgment on Section 11 claims is granted as to liability; and because Cendant concedes $11,661,078.96 in Section 11 damages, partial summary judgment as to that amount of damages is also granted.