**In re CYLINK SECURITIES LITIGATION**

**No. C–98–4292–VRW.**

United States District Court, N.D. California.

Aug. 29, 2001.

William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Jules Brody, Stull Stull & Brody, New York City, Robert C. Schubert, Schubert & Reed LLP, San Francisco, CA, Sherrie R. Savett, Jacob A. Goldberg, Berger & Montague, P.C., Philadelphia, PA, Kevin J. Yourman, James E. Tullman, Elizabeth P. Lin, Weiss & Yourman, Los Angeles, CA, Michael D. Braun, Stull Stull & Brody, Los Angeles, CA, Allyn Z. Lite, Goldstein Till & Lite, Newark, NJ, Paul O. Paradis, New York City, Thomas G. Shapiro, Shapiro Haber & Urmy, LLP, Boston, MA, Joseph H. Weiss, Weiss & Yourman, New York City, Stephen J. Fearon, Jr., Abbey Gardy & Squitieri, New York City, James J. Seirmarco, Abbey Gardy & Squitieli, LLP, San Francisco, CA, Peter H. Rachman, Goodkind Labaton Rudoff & Sucharow LLP, Ft. Lauderdale, FL, Jeffrey S. Abraham, New York City, John F. Innelli, Michael Molder, Innelli & Molder, Philadelphia, PA, Barbara J. Hart, Goodking Labaton Rudoff & Sucharow LLP, New York City, Brian P. Murray, Rabin & Peckel, New York City, for plaintiff.

Boris Feldman, Maura L. Rees, Leo P. Cunningham, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Robert L. Maines,

Janet C. Medlin, Bryant Clohan Ott Maines & Baruh, Palo Alto, CA, Daniel J. Bergeson, Donald P. Gagliardi, Benjamin J. Holl, Bergeson & Eliopoulos LLP, San Jose, CA, for defendants.

## ORDER

WALKER, District Judge.

This matter is a consolidated class action arising out of alleged accounting misstatements. and brought on behalf of all purchasers of Cylink Corporation common stock between April 23 and November 5, 1998, against the company and three former senior officers, Fernand B Sarrat; John H Daws and Thomas L Butler. On November 6, 2000, the court entered an order dismissing without prejudice plaintiffs' original consolidated complaint on the grounds that plaintiffs failed sufficiently to allege defendants' state of mind as required by the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 USC § 78u–4(b)(2). See 11/6/00 Order (Doc # 80).

Plaintiffs timely filed an amended consolidated complaint (ACC) on December 6, 2000. Doc # 81. Defendants again move to dismiss, but this time they have filed three separate motions. Docs # 84, 85 and 88. For the reasons set forth below, the motions are DENIED IN PART and GRANTED IN PART.

## I

Because this is a motion to dismiss, the following facts pertinent to the motion at bar come from the ACC.

Cylink is in the business of developing, marketing and supporting computer broadcast network security products. ACC (Doc # 81), ¶ 6. During the class period, Sarrat was Cylink's President and CEO; Daws was the CFO and VP of Finance and Administration and later became the VP of Business Development and Butler was the VP of Sales and Marketing. Id, ¶¶ 7–9.

Plaintiffs allege that due to the deliberately reckless conduct of these three senior officers, Cylink made two material misrepresentations to the market in which Cylink's shares traded: (1) Cylink's first quarter 1998 revenues were overstated by $7.8 million or 97.5 percent, id, ¶¶ 22–27; and (2) Cylink's second quarter 1998 revenues were overstated by $5.7 million or 46 percent, id, ¶¶ 28–33. The misrepresentations were made in Cylink's Form 10–Q reports to the SEC filed, respectively, on May 13, 1998, and August 12, 1998. Defendants do not dispute that these alleged misstatements are sufficiently particularized to meet the heightened pleading standards of both FRCP 9(b) and the PSLRA as interpreted in *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970 (9th Cir.1999). Defendants advance various other grounds for dismissal, but mostly focus on what they contend is the ACC's failure adequately to allege scienter of defendants.

## II

Before turning to defendants' specific arguments, a few familiar principles require mention. In reviewing a FRCP 12(b)(6) motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff. See *Silicon Graphics,* 183 F.3d at 980 n. 10. Dismissal is appropriate only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Section 10(b) of the Exchange Act states that it shall be unlawful "for any person * * * [t]o use or employ, in connection with the purchase or sale of any secu-

rity * * * any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 USC § 78j(b). The SEC implemented section 10(b) by issuing Rule 10b–5 that declared it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10–5(b).

The PSLRA instituted two heightened pleading requirements for such claims. *Silicon Graphics,* 183 F.3d at 974. First, a private securities plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, * * * state with particularity all facts on which that belief is formed." 15 USC § 78u–4(b)(1). Second, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 USC § 78u–4(b)(2). The Ninth Circuit has interpreted this second requirement to obligate the plaintiff "to plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics,* 183 F.3d at 974.

### A

As touched upon above, the court dismissed the original complaint in this matter because plaintiffs failed to plead particular facts in that complaint sufficient to establish the necessary state of mind for any of the defendants. See 11/6/00 Order (Doc # 80). Plaintiffs' principal efforts in this regard were contained in a section entitled "Defendants' Scienter," in which plaintiffs set forth three primary allegations regarding defendants' state of mind. See Compl (Doc # 65), ¶¶ 34–38. Plaintiffs first pointed to the existence of internal controls at public companies such as Cylink to imply that the magnitude of the premature revenue recognized was beyond the capability of a few "rogue" sales representatives and thus must have been known by defendants. *Id,* ¶ 35. Plaintiffs next alleged that the magnitude of the premature revenue recognition indicated that defendants either knew or disregarded the problem with deliberate recklessness. *Id.* Finally, plaintiffs described a home loan that Cylink gave to Sarrat, which would be paid down by Cylink only if it experienced substantial earnings, to suggest that Sarrat possessed a unique motive to enhance Cylink's financial performance. *Id,* ¶ 38. The court concluded that these allegations, although on the right track, did not rise to the level necessary to satisfy the PSLRA standard for pleading state of mind as required by the Ninth Circuit. See 11/6/00 Order (Doc # 80) at 8–15.

In submitting the ACC, plaintiffs completely abandoned these allegations. Instead, plaintiffs now attempt to plead defendants' state of mind by setting forth two sets of allegations in the "Defendants' Scienter" section of the ACC. See ACC (Doc # 81), ¶¶ 34–51. Plaintiffs also refer to the information "set forth" in a complaint filed by the SEC on September 27, 2000, in which the SEC alleges fraudulent revenue recognition practices by Daws, Butler and one other former Cylink executive. Rees Decl (Doc # 89), Exh A. Because the ACC refers to the contents of the SEC complaint and no party challenges the SEC complaint's authenticity, the court may also consider the allegations contained therein when evaluating the sufficiency of plaintiffs' allegations under the PSLRA. See *Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir.1998); *Branch v.*

*Tunnell,* 14 F.3d 449, 453–54 (9th Cir. 1994).

The first set of allegations appear to be designed to describe the state of mind of Daws and Butler (and derivatively, Cylink). See *id,* ¶¶ 38, 40, 43, 45 and 47. Plaintiffs first point to the "standard of ordinary care for revenue recognition" as established by the Statement of Financial Concepts No 5 and the Accounting Standards Executive Committee's Statement of Position 97–2 (hereinafter, GAAP) and allege that these defendants engaged in an "extreme departure" from this standard by improperly recognizing revenue on transactions during the first two quarters of 1998. *Id,* ¶ 34; see also *id,* ¶ 27. Plaintiffs describe in detail five example transactions for which revenue was allegedly recognized prematurely under GAAP. *Id,* ¶¶ 36–47. For instance, plaintiffs allege that Citibank submitted a purchase order for $1.3 million worth of Cylink's product in March 1998, but instructed Cylink not to invoice the sale until Citibank designated the installation site and Cylink actually shipped the product. *Id,* ¶ 37. Plaintiffs allege that, instead, Cylink shipped the equipment to a third party warehouse to await Citibank's instructions for delivery, but recorded the purchase order as a sale with set payment dates. *Id.* Plaintiffs allege that "[n]o risks of ownership passed to * * * Citibank and Cylink retained specific performance obligations," and, accordingly, revenue was improperly recognized. *Id.*

The other four transactions detailed in the ACC are similar in that for each transaction, revenue was allegedly recognized in violation of GAAP regulating revenue recognition. See *id,* ¶¶ 39–47. Plaintiffs also point to the information in the SEC complaint as further support for these allegations against Daws and Butler. Rees Decl

(Doc # 89), Exh A; see ACC (Doc # 81), ¶¶ 38, 40, 43, 45 and 47.

The second set of allegations are seemingly directed at establishing Sarrat's state of mind (and derivatively, Cylink's). Plaintiffs allege that Sarrat established a 1998 revenue goal of $100 million even though Cylink had never generated more than $50 million in one year, ACC (Doc # 81), ¶ 48, insinuating that Sarrat would later have a reason to exaggerate the company's financial performance in order to attain the goal. Plaintiffs also allege that since Sarrat made his own statement in the April 23, 1998, press release, he was under a duty to review Cylink's accounts receivable turnover ratio prior to making such statement. *Id,* ¶ 49. Plaintiffs allege that such a review would have disclosed to Sarrat that revenue was being recognized prematurely, thereby demonstrating that Sarrat acted with deliberate recklessness. *Id,* ¶ 50.

With respect to the state of mind of Cylink, plaintiffs allege that "Cylink's corporate scienter is derivative of, or concurrent [sic] with that of its officers and directors * * *." *Id,* ¶ 35; see also *id,* ¶ 38, 40, 43, 45, 47 and 51. No specific allegations of Cylink's scienter distinct from that of the individual defendants is alleged.

**B**

The court first addresses whether plaintiffs have adequately pled a cause of action under section 10(b) against Daws. Consistent with each of the defendants, Daws primarily asserts that the ACC fails sufficiently to allege that he acted with the required state of mind.

As a threshold matter, the court notes that Daws signed the financial statements for the first two quarters of 1998. As a result, such statements can be attributed, at the very least, to Daws. See *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1061–

63 (9th Cir.2000). "[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." Id at 1061.

Nevertheless, Daws contends that he cannot be liable for such statements because the ACC fails to state, "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct" by Daws. *Silicon Graphics*, 183 F.3d at 974. The court does not agree. As with the original complaint, plaintiffs begin their allegations of scienter by discussing the rules for proper revenue recognition and then asserting that defendants did not follow these rules. ACC (Doc # 81), ¶¶ 27 and 33. The court previously concluded that such allegations in the original complaint came close to making scienter a strong inference, but plaintiffs needed to go one step further. See 11/6/00 Order (Doc # 80) at 15–16. In the ACC, plaintiffs have satisfactorily taken that extra step with respect to Daws.

Specifically, plaintiffs describe five transactions that occurred during the first two quarters of 1998 in which revenue recognition principles under GAAP were allegedly violated. See ACC (Doc # 81), ¶¶ 34–47. Plaintiffs allege that Daws served as the Chief Financial Officer and Vice President of Finance and Administration for Cylink during the class period. *Id*, ¶ 8. As the CFO, Daws was responsible for ensuring that Cylink complied with its own revenue recognition policy and with GAAP. Rees Decl (Doc # 89), Exh A, ¶ 42. Plaintiffs allege in the ACC that Daws was aware of a provision in a $1 million transaction that allowed the customer the right to exchange the ordered product with different product; Daws "allowed the recognition of revenue" anyway. *Id*, ¶ 39. Plaintiffs further refer to transactions de-

tailed in the SEC complaint that occurred during the first two quarters of 1998. For example, Daws allegedly knew that a June 1998 order for $903,000 gave the customer the right to cancel its order within 90 days; but Daws nevertheless "allowed Cylink to recognize revenue on this transaction in the second quarter." Rees Decl (Doc # 89), Exh A, ¶ 65.

■ To be sure, allegations of a failure to follow GAAP, standing alone, do not create a strong inference of scienter. *Hockey v. Medhekar*, 30 F Supp 2d 1209, 1224 (N.D.Cal.1998). But particular facts about significant and specific GAAP violations can support an inference that the individuals responsible for such violations acted with scienter. See 11/6/00 Order (Doc # 80) at 16; *McKesson HBOC, Inc. Sec. Litig.*, 126 F Supp 2d 1248, 1273 (N.D.Cal.2000) ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves.").

■ Similar to the case at bar, *McKesson* involved allegations of premature revenue recognition. See *McKesson*, 126 F Supp 2d at 1272. In addressing the sufficiency of plaintiff's complaint, the *McKesson* court observed that plaintiffs should make the following allegations when alleging irregularities in revenue recognition:

(1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transactions; ■ the dates of any transactions; or (4) the identities of any of the customers or company employees involved in the transactions.

*Id.* at 1273 (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir. 1999)) (internal punctuation omitted). When these allegations demonstrate that

the GAAP violations at issue constituted a "widespread and significant inflation of revenue, * * * a strong inference arises that senior management intentionally misstated earnings." *Id.*

Plaintiffs' ACC contains all of this information. With respect to the March 1998 transaction, for example, plaintiffs allege that it resulted in "$1 million [of] revenue" that should not have been recognized "under both Cylink's revenue recognition policy and GAAP" because, among other reasons, "[t]he exchange provision [in the deal] made it clear the customer did not have a fixed purchase commitment." ACC (Doc # 81), ¶ 39. Plaintiffs point out, therefore, that the transaction "overstated Cylink's quarterly revenue alone by a material 12.5%." *Id.* Plaintiffs also describe the product, the customer and the employees involved in the transaction. As plaintiffs allege, the product, "PrivateWire software," was sold to "the Russian American Communications Corporation * * *, a distributor attempting to sell encryption products to the government of Argentina," for which "Butler instructed the sales force to solicit" and "Daws allowed the recognition of revenue." *Id.*, ¶¶ 36, 39–40.

The court concludes that these allegations, especially when combined with the other transactions detailed in the SEC complaint, provide strong circumstantial evidence that Daws was deliberately reckless or acted with conscious misconduct in recognizing the revenue at issue.

Daws' efforts to argue otherwise are not persuasive. Daws essentially contends that the ACC is insufficiently specific because plaintiffs do not allege that Daws reviewed the documents related to the identified transactions or was deliberately reckless in not reviewing such documents. Daws Br (Doc # 84) at 5–6. As plaintiffs correctly point out, however, they are only obligated to state some set of facts which

give rise to a strong inference of deliberate recklessness. See *Silicon Graphics,* 183 F.3d at 985. If the facts alleged by plaintiffs accomplish that objective, it is irrelevant whether another set of facts could likewise have been alleged. Accordingly, the ACC and documents incorporated by reference sufficiently allege that Daws acted with the state of mind required by the PSLRA.

■ Daws also seeks dismissal under the PSLRA's first pleading requirement by asserting that the ACC fails to set forth all facts with particularity on which the allegations against Daws are based. Daws Br (Doc # 84) at 6–8. This argument, however, has already been rejected by the court. See 11/6/00 Order (Doc # 80) at 6–7.

Daws is correct to point out that the PSLRA's first requirement mandates that a securities fraud complaint based on information and belief state "with particularity all facts on which [plaintiffs'] belief is formed." 15 USC § 78u–4(b)(1). But the ACC contains allegations in this regard that are identical to those in the original complaint. Specifically, plaintiffs describe the financial statements for the first two quarters of 1998, as well as the relevant GAAP of revenue recognition, and point out that the financial statements were restated on February 11, 1999. ACC (Doc # 81), ¶¶ 22–33, 52. These facts set forth the basis for plaintiffs' belief that revenue was prematurely recognized during 1998 and that the original statements regarding such information were incorrect. As a result, the court found such allegations to be sufficient under the first prong of the PSLRA's particularity requirement.

Daws attempts to deflect this finding from applying to him by asserting that he has not admitted the falsity of the statements because he was no longer employed by Cylink when its revenues were re-

stated. But plaintiffs' belief that the original statements were incorrect was not based on defendants' admissions of falsity; rather, the mere fact that the statements were restated at all supports such an inference.

Under the first prong of the PSLRA's particularity requirement, plaintiffs are obligated to allege facts demonstrating how their "belief [that the statements at issue are false] was formed." 15 USC § 78u–4(b)(1). As the court previously noted, one fact can be a sufficient basis upon which to form such a belief. Whether Daws participated in the decision to restate the earlier statements or not, therefore, the existence of restated financial results is sufficient to support plaintiffs' belief that the statements were misstated.

For these reasons, the court concludes that plaintiffs have adequately pled a cause of action under section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Daws' motion to dismiss (Doc # 84) with respect to this claim is thus DENIED.

C

 The court next addresses whether plaintiffs have adequately pled a cause of action against Butler. The court need not address whether plaintiffs have sufficiently pled Butler's state of mind because Butler puts forth another argument that is dispositive of the claims alleged against him. Specifically, Butler points out that the ACC (and the SEC complaint referred to therein) fail to allege that Butler made any of the misleading statements at issue or that he was involved in the process of improperly recognizing revenue. Butler Br (Doc # 85) at 5–7.

In the ACC, plaintiffs allege that Butler was the "Vice President [of] Sales and Marketing" during the class period. ACC (Doc # 81), ¶ 9. Plaintiffs further allege

that "Butler instructed the Cylink sales force to solicit" one of the transactions for which revenue was later recognized prematurely. *Id.*, ¶ 39. The SEC complaint also contains several allegations that Butler solicited orders and provided special terms to certain customers. Rees Decl (Doc # 89), Exh A, ¶¶ 39, 41, 44, 53 and 62. For each of these transactions, however, Butler is not alleged to have been involved in the process of revenue recognition or the issuance of the company's financial statements. Rather, as Butler points out, all of the allegations relating to Butler simply show that he engaged in his job— making sales for the company.

At best, therefore, plaintiffs only allege that Butler assisted other defendants who allegedly committed securities fraud violations. The Supreme Court has foreclosed claims for aiding and abetting under section 10(b). *Central Bank of Denver, NA v. First Interstate Bank of Denver, NA,* 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("[W]e again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. * * * The proscription does not include giving aid to a person who commits a manipulative or deceptive act.").

Plaintiffs all but concede this reality by citing *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1061 n. 5 (9th Cir.2000), for the proposition that an officer of a registered company can be liable "for material misrepresentations or omissions which the officer help[ed to] prepare." Pl Opp Br (Doc # 94) at 14. Indeed, the *Everex* court notes that "substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements." *Id.* (citation omitted). But that is exactly Butler's

point. Unlike Daws, Butler did not sign the financial statements at issue. Plaintiffs, therefore, must allege that Butler substantially participated or was intricately involved in preparing the statements. *Id.* No such allegations have been made.

As a result, none of the statements at issue in this matter can be attributed to Butler. Butler's motion to dismiss (Doc # 85) is thus GRANTED.

### D

■ The court next turns to plaintiffs' case against Sarrat. Similar to Butler, plaintiffs have not alleged that Sarrat signed the financial statements for the first two quarters of 1998. Nor have they alleged that he substantially participated or was intricately involved in the preparation of such statements. Moreover, the SEC complaint to which plaintiffs refer contains no such allegations because the SEC chose not to sue Sarrat. For the reasons set forth above, therefore, plaintiffs have failed to allege that the quarterly reports can be attributed to Sarrat.

Plaintiffs do not disagree. As evidenced from the ACC and plaintiffs' opposition brief, their entire case against Sarrat is based on the following statement that he made in the press release issued on April 23, 1998:

> As a result of substantial revenue growth and strong cost control, this marks the first quarter in which our information security business—which is now our only business—has achieved meaningful operating profitability.

ACC (Doc # 81), ¶ 49; see also Pl Opp Br (Doc # 94) at 7–8. Plaintiffs argue that this statement was misleading because it does not reflect the improperly recognized revenue that was taking place at the company during the first quarter of 1998.

Sarrat argues that plaintiffs have again failed to plead facts creating a strong inference that he knew the above statement was false when made or was deliberately reckless regarding the accuracy of the statement. Importantly, none of the example transactions of improperly recognized revenue alleged by plaintiffs were directed at Sarrat. Thus, plaintiffs have not alleged that Sarrat was aware (or even should have been aware) of a single improperly recognized revenue transaction.

Instead, plaintiffs base their allegations in support of Sarrat's scienter on two sets of facts. First, plaintiffs point out that Sarrat established a 1998 revenue goal of $100 million even though Cylink had never generated more than $50 million of revenue in one year. ACC (Doc # 81), ¶ 48. This fact certainly does not suggest the type of scienter required by the PSLRA. Although plaintiffs appear to imply that Sarrat would have a motive to exaggerate the company's financial results in order to attain the larger revenue goal, such an implication is insufficient in the Ninth Circuit to support a strong inference of scienter. See *Silicon Graphics,* 183 F.3d at 974–75 (rejecting the Second Circuit standard allowing plaintiffs to plead mere "motive and opportunity" or an inference of recklessness to support a defendant's state of mind under the PSLRA). In any event, plaintiffs also allege that Cylink acquired an Israeli software encryption company shortly before the beginning of 1998 and shifted the focus of the company from hardware to software. ACC (Doc # 81), ¶ 48. Hence, the fact that Cylink was initiating a completely new business would appear to warrant a completely different revenue goal.

Second, plaintiffs allege that Sarrat was obligated to review Cylink's A/R turnover before issuing his statement in the April 23 press release. *Id.,* ¶ 49. Plaintiffs allege

that a review of the decline in A/R turnover from the third quarter of 1997 to the fourth quarter of 1997 would have demonstrated to Sarrat that Cylink was prematurely recognizing revenue. *Id*, ¶ 50. The court concludes, however, that these allegations do not make scienter on the part of Sarrat a strong inference.

As a threshold matter, plaintiffs cite Item 303 of Regulation S–K as creating a duty for Sarrat to "disclose * * * the existence of 'known trends or any known demands, commitment, events or uncertainties' at Cylink that would 'result in or that are reasonably likely' to have a material impact on the Company's net sales, revenues, income from operations or liquidity." ACC (Doc # 81), ¶ 49 (quoting 17 CFR § 229.303). Based on this, plaintiffs allege that Sarrat was under a duty to review financial trends such as the A/R turnover before issuing the April 23 statement. *Id*. Plaintiffs' allegation that Sarrat was under a duty to review the A/R turnover is necessary to attempt to demonstrate that Sarrat in fact reviewed the ratio.

Defendants correctly point out, however, that Regulation S–K does not govern statements contained in press releases because press releases are not required to be filed with the SEC. See 17 CFR § 229 .10. As a result, plaintiffs cannot point to Regulation S–K to demonstrate that Sarrat must have looked at the A/R turnover before making his statement.

In an effort to avoid this hurdle, plaintiffs argue in their opposition brief that the company must file other documents with the SEC, such as the Form 10–Q for the first quarter of 1998, which independently trigger a duty for senior management to review Cylink's A/R turnover. But the ACC does not allege this fact with respect to Sarrat. In fact, the complaint simply alleges that Sarrat's duty to review Cylink's A/R turnover was triggered entirely

by "his statement." ACC (Doc # 81), ¶ 49. Without alleging facts that demonstrate Sarrat issued his statement after actually reviewing the A/R turnover, which allegedly indicated revenue was being prematurely recognized, plaintiffs cannot show that Sarrat acted with scienter.

Even if plaintiffs had sufficiently alleged that Sarrat reviewed the A/R turnover, defendants contend that the downward trend between the third and fourth quarters of 1997 alleged by plaintiffs was calculated incorrectly. Cylink Br (Doc # 88) at 14. Plaintiffs allege in the ACC that the A/R turnovers for the third and fourth quarters of 1997 were 1.0766 and 0.7110. ACC (Doc # 81), ¶ 50. According to plaintiffs, this "drastic decline" of "approximately 34%" should have informed Sarrat that the company was improperly recognizing revenue. *Id*. Defendants point out, however, that plaintiffs utilized the wrong revenue figure for the fourth quarter of 1997. The revenue reported by Cylink for the fourth quarter was not $16.8 million, as plaintiffs have quoted, but, rather, was $25.6 million. See Rees Decl (Doc # 89), Exh C. The court may take judicial notice of this fact. Based on the actual revenue figure, Cylink's A/R turnover for the fourth quarter of 1997 would be 1.0843, a slight improvement over the third quarter. In short, therefore, even if Sarrat had reviewed the A/R turnover prior to making his statement, no downward trend would have been disclosed.

The court recognizes that plaintiffs have attempted to heed this court's recommendation that they should point to departures from benchmarks as support for the state of mind of defendants. See 11/6/00 Order (Doc # 80) at 15. But it is imperative that any benchmarks alleged actually reflect the type of trend that would suggest defendants acted with deliberate recklessness or conscious misconduct. The one

benchmark discussed by plaintiffs, therefore, does not contribute to an inference of scienter.

As a result, the court concludes that plaintiffs have failed to allege sufficiently that Sarrat was deliberately reckless or consciously aware of the misleading nature of his April 23 statement. Sarrat's motion to dismiss (Doc # 88) is thus GRANTED.

### E

■ Finally, the court turns to the most interesting question raised by defendants' motions: whether plaintiffs have adequately alleged scienter on the part of Cylink itself. As noted, the PSLRA requires plaintiffs to plead facts specific to the knowledge of each defendant. 15 USC § 78u–4(b)(2). Understandably, the ACC contains no allegations specifically regarding the state of mind of the company. This is no surprise given the fact that corporations are incapable of acting except by and through their agents and employees. *New York Central & Hudson River RR v. United States*, 212 U.S. 481, 493, 29 S.Ct. 304, 53 L.Ed. 613 (1909); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, NA*, 30 F.3d 339, 344 (2d Cir.1994). As a result, plaintiffs allege scienter with respect to the individual defendants and assert that Cylink's scienter is derived therefrom. ACC (Doc # 81), ¶ 35.

Cylink responds to this allegation by arguing that: "[g]enerally * * * the knowledge acquired by the agent who is acting adversely to his principal will not be attributed to the principal." *FDIC v. O'Melveny & Meyers*, 969 F.2d 744, 750 (9th Cir.1992) (citation omitted), rev'd on other grounds, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Defendants also rely on other authorities: "[T]he knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation." *In re*

*Cendant Corp. Sec. Litig.*, 109 F.Supp.2d 225, 232 (D.N.J.2000) (quoting *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407 (5th Cir.1993)) (other citations omitted). To these authorities, Cylink adds a citation to Judge Posner's opinion in *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.1982), in which Judge Posner drew a distinction between fraud committed against the interests of the corporation and fraud committed for the benefit of the corporation. In *Cenco*, the alleged fraud overvalued the company's shares which were then "used to buy up other companies on the cheap," hence, the benefit to the corporation. *Id* at 451. *Cenco* did not involve the sufficiency of a pleading in an open market securities fraud claim; rather, it involved a securities fraud class action corporate defendant's cross-claim against its auditor and the auditor's FRCP 13(g) cross-claim against the corporation. *Cenco* addressed the circumstances under which fraud by corporate employers is a defense in a suit by the corporation against its auditors for failure to prevent the fraud. Cylink would, however, draw from *Cenco* a principle that in order adequately to plead a securities fraud class claim, plaintiffs must allege that the corporation derived some benefit from the fraud wholly apart from whatever benefit might have accrued to corporate insiders.

Cylink's inference represents a pretty ambitious extension of the law. First, of course, *Cenco* applied Illinois law, not federal law or California law. Second, misstatements disseminated to a securities market seldom, if ever, benefit the issuer of the securities. Occasionally, a fact pattern similar to *Cenco* may occur in which it can be contended that distorting the price of the security allowed the issuer to get away with something, as was the case in *Cenco*. But chickens have a way of coming home to roost. When they do so in the

form of securities class action plaintiffs, a corporation has hell (and usually a great deal of money) to pay. Third, most securities class action recoveries are funded not by the corporate insiders, but by the corporate issuer and insurance proceeds from policies paid for by the issuer. Taking the corporation out of the class action for want of allegations of corporate benefit might well endanger these sources of recovery.

Fourth, there is the matter of what appears to be the law of this circuit. A corporate entity can be vicariously liable under section 10(b) for the fraud of its officers. See *McKesson,* 126 F Supp 2d at 1277 (citing *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1576–78 (9th Cir. 1990)). So long as scienter is appropriately alleged for the officers and directors of a company, then it is appropriately alleged for the company itself. Plaintiffs rely on *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435–36 (9th Cir.1995), for this proposition, although the case affords weak support.

In *Nordstrom,* an insurance company attempted to avoid paying a portion of a settlement based on its assertion that the uninsured corporate entity was exclusively responsible for some of the conduct at issue. See *id.* at 1429–30. The crucial issue, therefore, was whether the corporation could possess intent even if none of the officers and directors had such intent. See *id.* at 1435. This issue is the mirror image of the question triggered by the ACC in the case at bar, namely, whether the corporate entity *must* possess the intent held by its officers. Indeed, the *Nordstrom* court noted that "corporate scienter relies heavily on the awareness of directors and officers," *id.* at 1435–36, but this language merely restates the principle of vicarious liability for corporations that the court discussed above. As defendants point out, general agency law suggests

that the state of mind of an officer may not be imputed to the corporate entity under certain circumstances, specifically, when the officer is not alleged to have acted for the benefit of the company.

Plaintiffs' attempt to imply that Cylink's scienter can alternatively be found in Cylink's independent duty to prepare corporate disclosures misses the point. See Pl Opp Br (Doc # 94) at 5–6. Defendants do not dispute that statements in Cylink's SEC filings are attributable to Cylink; rather, the inquiry is whether the state of mind of the individuals who prepared the statements is attributable to Cylink. Judge Walls recognized in *Cendant* that imputation of an officer's knowledge may only occur "when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation * * *." *Cendant,* 109 F Supp 2d at 233 (citation omitted).

In sum, the court finds the presentations on both sides of this issue unconvincing. The motion to dismiss must, therefore, be DENIED and the issue possibly revisited later in the litigation. What it may all come down to is damages. If a misleading corporate dissemination benefits the issuer, then presumably its shareholders were benefitted at least indirectly. How many of those beneficiaries are class members in an open market securities fraud class action depends on the timing of their purchases of stock. But if the corporation benefitted by the alleged misstatement, that may be a reason to dismiss the shareholders' claim. If the corporation did not benefit, the shareholders presumably are net losers. In any event, neither the allegations or arguments at bar afford answers and so Cylink must—for now, at least—remain in the case.

### III

██ Plaintiffs also assert claims for "controlling person" liability against the

individual defendants under section 20(a) of the Exchange Act, 15 USC § 78t(a). See ACC (Doc # 81), ¶¶ 67–69. In order to state a claim for liability under section 20(a), plaintiffs must allege (1) that a "primary violation" of Rule 10b–5 or other provision was committed and (2) that each defendant "directly or indirectly" controlled the violator. *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996). "In general, the determination of who is a controlling person * * * is an intensely factual question." *Id.* (citation omitted). Despite the urging of at least one of the individual defendants, plaintiffs need not allege the controlling person's scienter or that they "culpably participated" in the alleged wrongdoing. *Id.* (citation omitted).

First, under the allegations of the ACC, Cylink is the only possible "violator" because plaintiffs allege that the individual defendants are controlling persons "of the Company." ACC (Doc # 81), ¶ 10. In light of the court's conclusion that plaintiffs' claim under Rule 10b–5 against Cylink survives, plaintiffs have satisfied the first element of a section 20(a) claim.

Second, plaintiffs allege that the individual defendants, "by virtue of their executive and managerial positions had the power to control and influence [Cylink], which they exercised * * *." The court finds these allegations sufficient to support an inference that the individual defendants controlled Cylink and its operations. As noted, plaintiffs need not allege that the individual defendants actually participated in the wrongful conduct or exercised actual power to be derivatively liable under section 20(a). *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000); *Paracor*, 96 F.3d at 1161. To be sure, to the extent plaintiffs present evidence at a later stage of the proceedings demonstrat-

ing such control, the individual defendants will be given the opportunity to assert good faith defenses or lack of participation. *Howard*, 228 F.3d at 1065. At the current time, however, the court concludes that plaintiffs have sufficiently alleged control to state a claim against Sarrat, Butler and Daws.

Accordingly, to the extent these motions address section 20(a), they are DENIED.

## IV

In sum, the motions to dismiss filed by Cylink, Sarrat, Butler and Daws (Docs # 84, 85 and 88) are DENIED IN PART and GRANTED IN PART. Specifically, to the extent Butler and Sarrat seek dismissal of plaintiffs' section 10(b) claims against them, their motions (Docs # 85 and 88) are GRANTED. To the extent these motions address the section 20(a) claims, however, they are DENIED. In addition, the motions to dismiss filed by Cylink and Daws attacking plaintiffs' claims under section 10(b) and 20(a) (Docs # 84 and 88) are DENIED in their entirety.

IT IS SO ORDERED.